**STATE of North Dakota, Plaintiff
and Respondent,**

v.

**James Leroy IVERSON, Defendant
and Appellant.**

Crim. Nos. 390, 393.

Supreme Court of North Dakota.

April 8, 1971.

As Amended and Rehearing Denied
May 13, 1971.

Shaft, Benson, Shaft & McConn, Grand Forks, for defendant and appellant.

Helgi Johanneson, Atty. Gen., Bismarck, and John A. Alphson, State's Atty., and Robert Alphson, Asst. State's Atty., Grand Forks, for plaintiff and respondent.

ERICKSTAD, Judge (on reassignment).

On May 2, 1969, James Leroy Iverson was found guilty by a jury in the District Court, Grand Forks County, of the crime of murder in the first degree of Diane Patricia Bill and of the crime of murder in the second degree of Carol Mayers, the two cases having been consolidated for trial. On May 9, 1969, Iverson was sentenced to life imprisonment at hard labor for murder in the first degree and to an indeterminate

sentence of imprisonment at hard labor from twenty-five to thirty years for murder in the second degree, the sentences to run concurrently.

On July 22, 1969, Iverson appealed to this court from the verdicts rendered on May 2, 1969, and from the judgments of the District Court entered on May 9, 1969. On November 17, 1969, Iverson appealed to this court from the order of the District Court denying his motion for a new trial. In this opinion we will consider all issues.

At approximately 10:30 in the morning of Wednesday, November 27, 1968, in the city of Grand Forks, the bodies of Carol Mayers and Diane Patricia Bill were discovered in the apartment of Carol Mayers by the parents of Diane Bill. Mr. and Mrs. Bill had gone looking for their daughter after receiving a phone call from her employer informing them that Diane and Carol had failed to show up at work for the second consecutive morning. The record indicates that although Diane had her own apartment and had only been working with Carol for a few weeks, she had on several occasions walked to Carol's apartment so they could go to work together. Both girls had to be at work between 6:30 and 7:00 every morning. An autopsy performed later that day established that Carol died from traumatic asphyxiation, with findings compatible with strangulation, and that Diane died from traumatic asphyxiation, with findings compatible with manual strangulation.

An investigation was begun by the City of Grand Forks Police Department and by the Grand Forks County State's Attorney's Office. The investigation continued throughout the day of the discovery of the bodies, Wednesday, November 27, 1968. While police officers were investigating the scene of the crime, the State's attorney was conducting a State's Attorney's Inquiry into these deaths.

As part of the investigation at Carol's apartment, a bloodhound was used. A pillowcase found at the scene was used as the source of the scent given to the bloodhound. The trail followed by the bloodhound ended in the alley outside the apartment. After the bloodhound had been used at the scene of the crime, the pillowcase and the bloodhound were brought to the police station at approximately 5:15 p. m., when Iverson had just completed testifying at the State's Attorney's Inquiry. The bloodhound, having been given a scent from the pillowcase once again, followed a trail that led to Iverson.

Iverson was permitted to leave the police station, but later that evening, at approximately 8:00, while he was bowling with his league, Iverson was taken into custody by the State's Attorney and his administrative assistant. Subsequently, upon affidavits of several investigating officers, a search warrant was issued authorizing a search of Iverson's automobile and residence. In the course of the search of his residence, a coat, a towel, and a pair of trousers were seized. After he was taken into custody, Iverson was advised of his rights and was interrogated. His statements were taken down. These statements, together with his testimony at the State's Attorney's Inquiry, were used by the State for impeachment purposes in the course of Iverson's trial.

Iverson raises several constitutional issues, the first of which goes to the conduct of the State's Attorney's Inquiry. Section 11–19A–09, N.D.C.C., provides that when a state's attorney becomes cognizant of any violation or criminal act causing a person's death, he may inquire into the facts and may subpoena witnesses to testify. The statute authorizes the state's attorney to compel the attendance of witnesses in the same manner and with the same effect as if they had been subpoenaed by the judicial branch of government. The statute also provides that, "Any witness compelled to testify under the provisions of this section shall be entitled to counsel and all other constitutional rights."

Three persons were subpoenaed and testified at the State's Attorney's Inquiry held by the State's Attorney in the afternoon of Wednesday, November 27, 1968. Robert E. Shepler testified at 3:00 p. m. His roommate, Bruce Gustafson, testified at 3:45 p. m. Shepler and Gustafson lived in the apartment immediately below Carol's apartment. Iverson testified at 4:50 p. m., with his testimony being completed at approximately 5:15 p. m.

As to Iverson, the matters preliminary to his testimony at the State's Attorney's Inquiry were as follows:

"Q. Now, this is a state's attorney's inquiry as to the death of Carol Mayers and Diane Patricia Bill. I must advise you that you cannot refuse to answer the questions. Once the statement has been completed here and transcribed, you will be required to sign that this is your testimony. I must advise you that you have a right to have an attorney present during these questions if you so desire. What is your wish? I can tell you that the matter of the inquiry is the fact of a double murder or at least a homicide of one nature.

"A. Okay.

"Q. Okay what?

"A. Well, you said—proceed. The statement is all right with me.

"Q. All right.

"A. I don't understand it.

"Q. All right. Mr. Iverson, now we are talking about accounting for your time from approximately 3:30 Monday."

Iverson alleges that these proceedings were unconstitutional in that he was not given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). He further alleges that these proceedings were unconstitutional in that he was told he could not refuse to answer the questions and thus was compelled to testify against himself, in violation of Section 13 of the Constitution of North Dakota and in violation of the Fifth Amendment to the Constitution of the United States as made applicable to the states through the Fourteenth Amendment in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Both Section 13 and the Fifth Amendment provide that, "No person shall * * * be compelled in any Criminal Case to be a witness against himself * * *"

Miranda specifically reaffirmed the earlier decision of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). Escobedo held that the denial of counsel to an accused at the interrogation stage of the proceedings against him was a violation of the Sixth Amendment right to have the assistance of counsel for his defense as made applicable to the states through the Fourteenth Amendment in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963). Escobedo distinguished between an investigation and a proceeding designed to wrap up a case against a suspect.

"We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * * * and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." Escobedo v. Illinois, supra, 84 S.Ct. 1758, 1765.

Miranda also expanded the rights which must be granted to an accused to

protect his Fifth Amendment right not to be compelled to incriminate himself. As a result of this decision, an individual held for interrogation must be clearly informed that he has the right to counsel and to have his lawyer with him during any interrogation; that he has the right to remain silent; that anything stated by him can be used in evidence against him; that if he is an indigent a lawyer will be appointed for him; and that these warnings must be given prior to any interrogation. Once these warnings have been given and the individual in any manner indicates he wishes to remain silent, the interrogation must cease.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

At this point the Court inserted footnote 4:

"This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused." Miranda v. Arizona, *supra,* 86 S.Ct. 1602, 1612.

The preliminary matters discussed with Iverson at the State's Attorney's Inquiry fell short of the warnings required by *Miranda*. Although Iverson alleges that he was entitled to these warnings, the real issue is whether at the time of the State's Attorney's Inquiry he had the status of a person to whom the *Miranda* warnings must be given. That is, at the time of the State's Attorney's Inquiry, was Iverson a witness, or was he the suspect or the focus of the investigation?

In *Miranda* the U. S. Supreme Court condemned certain police interrogation methods designed to elicit confessions. These methods are psychologically rather than physically oriented.

"To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

"Even without employing brutality, the 'third degree' or the specific stratagems described above, the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." Miranda v. Arizona, supra, 86 S.Ct. 1602, 1617, 1618.

Following its analysis of these interrogation methods, of which the foregoing is but a small part, the Court stated:

"We have concluded that without proper safeguards the process of in-custody interrogation of *persons suspected or accused of crime* contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the *accused* must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

[Emphasis supplied.] Miranda v. Arizona, *supra,* 86 S.Ct. 1602, 1624.

Our reading of *Miranda* is not that every person questioned in the process of a criminal investigation must be given the *Miranda* warnings, but rather that these warnings must be given to any person who is suspected of having committed a crime, or upon whom the investigation is focused.

"General on-the-scene questioning as to facts surrounding a crime or *other general questioning of citizens in the fact-finding process* is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." [Emphasis supplied.] Miranda v. Arizona, *supra,* 86 S.Ct. 1602, 1629, 1630.

■ In other words, neither the Fifth Amendment to the United States Constitution nor Section 13, which is its counterpart in our State Constitution, requires that every witness questioned in a criminal fact-finding process be given the *Miranda* warnings.

Had Iverson been a suspect or the focus of the investigation at the time of the State's Attorney's Inquiry, his Fifth Amendment and Section 13 constitutional rights would have been violated by the failure to give him the *Miranda* warnings. Whether at the time of the State's Attorney's Inquiry he was a suspect or whether the investigation had focused upon him is a question of fact to be determined from the record. That he was later arrested and convicted of two counts of murder does not prove that he was the suspect or focus of the investigation at the time of the State's Attorney's Inquiry.

The record of the events up to and including the State's Attorney's Inquiry does not reveal facts sufficient to establish the probable cause necessary to take Iverson into custody. In the four cases decided in *Miranda* the defendant in each case had been arrested or "picked up" before he was subjected to custodial interrogation in which some of the methods condemned by *Miranda* were used for periods ranging from several hours to five days. Not only was probable cause for Iverson's arrest lacking at the time of the Inquiry, but so also was any substantial progress in the investigation.

At the time that Iverson arrived at the police station for the Inquiry, the investigation was only seven hours old. The cause of death had not been determined; the length of time the girls had been deceased was not known; witnesses had not been found who had heard or observed anything unusual relating to the girls in the past several days; substantial and revealing clues had not been found at the scene of the crime. In short, what the record reveals is that a full-scale investigation was being conducted and that the investigators were seeking any and all information that would explain the deaths of the two young women, and that up to and including the time of the State's Attorney's Inquiry, the information being gathered from all sources had not been correlated.

■ The Legislature viewed the consequences of a criminal act causing death as so serious that it created a procedure, Section 11-19A-09, N.D.C.C., wherein persons could be subpoenaed and compelled to testify concerning any such criminal act. The State's Attorney in this case merely made use of the statutory tool provided him. Each of the three men subpoenaed to testify at the State's Attorney's Inquiry was questioned in the presence of the State's Attorney, two police detectives, and a court reporter who transcribed the proceedings. A reading of those proceedings indicates that the interrogations were short (approximately half an hour each) and that the questions

asked of the witnesses called were not accusatorial or inquisitorial, but were merely designed to elicit any information that would assist in the investigation. When the proceedings were complete, the witnesses were permitted to leave. These proceedings do not resemble the custodial interrogation methods condemned by *Miranda.*

The State's Attorney's questioning of Shepler and Gustafson prior to the questioning of Iverson revealed no information which would lead a reasonable man to believe that Iverson was a suspect, upon whom the investigation would have focused.

Shepler and Gustafson testified that their apartment was directly below Carol's and that there were two registers between their apartments through which Shepler and Gustafson could hear sounds and see light coming from Carol's apartment. They were graduate physics students at the University of North Dakota in Grand Forks. They had developed certain study and leisure-time habit patterns. They would sleep late each morning; attend classes and activities at the University during the day; eat supper and watch television at their apartment for a while; and then leave to study at their offices in the physics building, usually until 2:00 in the morning, after which they would return to their apartment and retire. Both men testified that Carol had several regular male visitors who would come to her apartment very early in the morning (around 2:00 or 3:00).

Shepler testified that he heard someone in Carol's apartment get up and turn off an alarm clock that rang at approximately 3:15 Tuesday morning, November 26, 1968. He stated that the footsteps he heard had sounded like Carol's. That was the last sound that either of them heard coming from Carol's apartment. Shepler and Gustafson testified that they heard no unusual sounds or commotion from Carol's apartment, and that they had not heard any male visitors at Carol's apartment for

approximately a week prior to the discovery of the bodies of Carol and Diane.

Shepler also testified that as to Carol's male visitors, "It just seemed to me that there were about two or three guys that came pretty regular, and one of them either had a bum leg or something wrong with his leg, because you could tell it by the way he walked. One foot would hit heavier than the other."

Gustafson also had noticed this one visitor by his walk. His testimony was as follows:

"Q Do you know of any males who frequent that apartment?

"A Well, this sounds funny, but there is one guy. Bob was in during the summer. He had seen him come. I only heard him once, but they called him the one-legged guy because it was funny the way he walked up and down the stairs. I could tell there was something wrong. The cadence in the steps was different than normal, than a normal person's walk up and down the stairs. One foot hit— when one foot hit, it would sound different than the other foot. Naturally we thought he was lame or had an artificial leg or something like that. I only heard him once. Then I think sometime in October we heard one guy. We used to hear him go up and down the stairs, but you hear people going up and down stairs at night and late in the morning. Usually this one guy, this one we called the one-legged guy, would come late in the morning, early in the morning about 3:00 o'clock. And other times—sometime in October one guy came up there about 2:00 or 3:00 in the morning and knocked on the door and she let him in. It sounded like he was a little drunk because he kept asking her, 'Just have one beer, Carol, and I will go.' And she said, 'Jesus, it's 3:30 in the morning. Get out of here.' He wanted to have one beer. Meanwhile, he must have had a friend out in the car because then one more man came up the stairs. And she called him Jim. That's the only name we heard.

"Q She called him Jim?

"A Yes.

"Q Was there anything unusual as to this Jim's talk or mannerism?

"A Well, we didn't see him. All we heard was his voice. He didn't sound angry or anything."

Later on in his testimony he was asked:

"Q Mr. Gustafson, this man you call the one-legged man, is he the same one that Carol called Jim?

"A No. There were two different men.

"Q I see. The one-legged man went upstairs first?

"A Not the one-legged man. I think it was last Thursday night—not Thursday. I'd say maybe last Wednesday or Tuesday night of that last week.

"Q But the night you heard someone come up and later on another party came up and she used the name Jim, is that the night you heard the one-legged man go up?

"A No. It's a totally different noise. That was sometime in October, exactly when, I don't know."

Gustafson's testimony concluded as follows:

"Q Let me ask you this: At any time have you seen an automobile parked outside that may have been associated with that apartment, an automobile, truck, taxi-cab, or anything?

"A No. There are quite a few cars that park out there and some I have placed with certain apartments. But you ask if any of them are associated with certain apartments there. I don't know.

"Q Have you ever seen a taxi-cab parked out there?

"A A taxi-cab that comes once in a while to the place next door. I have noticed that.

"Q What cab company?

"A A black cab with a red sign, I guess Nodak. Now, whether this cab was going to the place next door to pick up somebody and take them some place, I don't know."

It should be noted that Iverson's first name is Jim; that at the time of his being taken into custody he was employed as a driver for Nodak Cab; and that he has an injured leg that requires the use of a heavily built-up shoe. It is significant to note also that Gustafson stated that the one-legged man and Jim were two different persons. It is also significant that neither Shepler nor Gustafson noticed any male visitor to Carol's apartment within a week of her murder, particularly the one-legged man, whose walk was so noticeable.

Our conclusion is that at the time of the State's Attorney's Inquiry, Iverson was merely a possible source of information and was not a suspect or the focus of the investigation. Accordingly, there was no need to give Iverson the *Miranda* warnings at that time.

An additional problem is posed, however, by the *Miranda* definition of "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, *supra,* 86 S.Ct. 1602, 1612. It must be conceded that one who testifies under the compulsion of a subpoena has his freedom of action limited in a significant way, as he must appear under compulsion of law. It would appear then that anyone subpoenaed to testify must be given the *Miranda* warnings even though he is in no way a suspect or the focus of the investigation. A subpoena, however, is the primary tool of the grand jury, the one fact-finding process written into the Fifth Amendment to the United States Constitution. And *Miranda* specifically provides that, "general questioning of citizens in the fact-finding pro-

cess is not affected by our holding." Miranda v. Arizona, *supra,* 86 S.Ct. 1602, 1629.

■ The State's Attorney's Inquiry is analogous to the grand jury. In State v. Ruggeri, 19 Utah 2d 216, 429 P.2d 969, 973 (1967), the Supreme Court of Utah affirmed the decision of the district court holding inadmissible certain testimony given before a grand jury when the witness subpoenaed to testify before the grand jury was in fact the target of its investigation. The Court recognized the right of the grand jury to compel witnesses to testify. This right is also recognized by Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). *Ruggeri,* however, distinguished between a witness and one who is the target of the investigation. In other words, the compulsion of testimony under a subpoena is not in itself enough to require that the *Miranda* warnings be given. Rather, the *Miranda* warnings need be given only to a person who is a suspect or a target of the investigation. We agree with *Ruggeri* in this regard and, accordingly, conclude that the compulsion of the subpoena did not require the giving of the *Miranda* warnings.

One final question raised with respect to the State's Attorney's Inquiry arises from the fact that Iverson was told that, "You cannot refuse to answer the questions." Iverson alleges that this statement alone constituted compulsion by the State which deprived him of his constitutional rights. Implicit in this allegation is the contention that, on the contrary, he should have been advised of his right not to be compelled to testify against himself. As we have concluded that Iverson was a witness at the time of the State's Attorney's Inquiry, we limit our consideration of this issue to the question of the rights of a witness under the Fifth Amendment and Section 13.

■ To advise a witness testifying under compulsion of a subpoena that he cannot refuse to answer the questions is not improper, as the purpose and legal

effect of a subpoena is to compel a witness to attend a legal proceeding and to testify. This power to compel the attendance and testimony of a witness is basic to our system of jurisprudence and has long been recognized. Shillitani v. United States, *supra,* 86 S.Ct. 1531, 1535; United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950); Blair v. United States, 250 U.S. 273, 39 S.Ct. 468, 470, 63 L.Ed. 979 (1919); Application of Caldwell, 311 F.Supp. 358, 360 (D.C.N.D.Cal.1970). It is the duty of a witness to answer every question relevant to the subject of the inquiry. Blair v. United States, *supra,* 39 S.Ct. 468, 471; State v. Blake, 46 Wis.2d 386, 175 N.W.2d 210, 212 (1970); O'Neal v. State, 468 P.2d 59, 71 (Okl.Cr.1970); Shippen v. C. I. R., 274 F.2d 860, 863 (C.A.5th 1960); 98 C.J.S. Witnesses § 430 (1957).

■ The power to compel testimony under a subpoena has long been subject to the "constitutional exemption from being compelled in any criminal case to be a witness against oneself, entitling the witness to be excused from answering anything that will tend to incriminate him. * * *" Blair v. United States, *supra,* 39 S.Ct. 468, 471.

■ This court in 1908 recognized the right of a witness before a grand jury to claim his Section 13 right not to be compelled to incriminate himself. In Re Beer, 17 N.D. 184, 115 N.W. 672, 675. This right, however, is personal and must be claimed by the witness. State v. Manning, 134 N.W.2d 91, 100 (N.D.1965); United States v. Luxenberg, 374 F.2d 241, 246 (C.A.6th 1967); Gollaher v. United States, 419 F.2d 520, 525 (C.A.9th 1969), cert. denied 396 U.S. 960, 90 S.Ct. 434, 24 L.Ed.2d 424 (1969); Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 440, 95 L.Ed. 344, 19 A.L. R.2d 378 (1951), rehearing denied 341 U.S. 912, 71 S.Ct. 619, 95 L.Ed. 1348 (1951); United States v. Merrell, 303 F.Supp. 490, 493 (D.C.N.D.N.Y.1969); State v. Dilworth, 83 S.D. 363, 159 N.W.2d 795, 798 (1968). Furthermore, a witness need not be advised of his Fifth Amendment (and,

correspondingly, his Section 13) right not to incriminate himself. United States v. Luxenberg, *supra,* 374 F.2d 241, 246; United States v. Fruchtman, 282 F.Supp. 534, 536 (D.C.N.D. Ohio 1968); United States v. DiMichele, 375 F.2d 959, 960 (C.A.3rd 1967); Robinson v. United States, 401 F.2d 248, 250 (C.A.9th 1968); Beckley v. State, 443 P.2d 51, 54 (Alaska 1968).

The State's Attorney's admonition to Iverson that he could not refuse to answer the questions submitted to him was superfluous, as he was required under the subpoena to appear and answer. Having earlier concluded that the compulsion of a subpoena upon a witness is not violative of his constitutional rights, we hold that a statute which merely enforces a subpoena is not violative of his constitutional rights. Accordingly, the application of the statute in this case did not violate Iverson's constitutional rights.

Notwithstanding that we have concluded that the State's Attorney's Inquiry did not violate Iverson's rights under *Miranda,* we think it significant to note that the U.S. Supreme Court has confined the effect of *Miranda* to illegally obtained evidence used by the prosecution in its case in chief. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), allowed a statement made by an accused in violation of his *Miranda* rights to be used to impeach him when he took the stand to testify in his own behalf.

"*Miranda* barred the prosecution from making its case with statements of an accused made while in custody prior to having or effectively waiving counsel. It does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.

"In Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954), the Court permitted physical evidence, in-admissible in the case in chief, to be used for impeachment purposes.

'It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths. Such an extension of the *Weeks* doctrine [Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652] would be a perversion of the Fourth Amendment.

'* * * [T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.' 347 U.S. at 65, 74 S.Ct. at 356.

"It is true that Walder was impeached as to collateral matters included in his direct examination, whereas petitioner here was impeached as to testimony bearing more directly on the crimes charged. We are not persuaded that there is a difference in principle that warrants a result different from that reached by the Court in *Walder.* * * * The impeachment process here undoubtedly provided valuable aid to the jury in assessing petitioner's credibility, and the benefits of this process should not be lost, in our view, because of the speculative possibility that impermissible police conduct will be encouraged thereby. Assuming that the exclusionary rule has a deterrent effect on proscribed police conduct, sufficient deterrence flows when the evidence in question is made unavailable to the prosecution in its case in chief.

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. * * * Having voluntarily taken the stand, petitioner was under an

obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." Harris v. New York, *supra*, 91 S.Ct. 643, 645, 646.

██ In this case, Iverson voluntarily took the stand in his own defense. There is no question that the trustworthiness of the evidence obtained at the State's Attorney's Inquiry satisfies legal standards; accordingly, Iverson's testimony at the Inquiry was properly used for impeachment purposes, notwithstanding that he was not given the *Miranda* warnings at the State's Attorney's Inquiry.

Iverson next alleges that his arrest was unlawful in that there was not probable cause to believe that he had committed the offense at the time of his arrest and in that it was not made in accordance with the arrest statutes. Accordingly, he contends that a handkerchief seized from him and testimony given by him subsequent to his arrest were improperly admitted in evidence as products of an unlawful arrest.

Iverson was taken into custody by the Grand Forks County State's Attorney and his administrative assistant shortly after 8:00 p.m., Wednesday, November 27, 1968, at a Grand Forks bowling alley. While the State's Attorney waited away from the bowlers, his administrative assistant twice observed Iverson as he was bowling. Although Iverson was wearing a long-sleeved shirt, the State's Attorney's administrative assistant, Leo Novacek, observed that Iverson had scratch marks on his hand and neck, thus verifying observations made by one of the detectives at the State's Attorney's Inquiry.

Apparently, between the time Iverson was released from the State's Attorney's Inquiry and the time the State's Attorney and his administrative assistant went to the bowling alley to observe Iverson, the Grand Forks Police Department and the State's Attorney's Office correlated the various information that their investigation to that time had produced. This information included the report of a detective that he had observed scratch marks on Iverson's hand and neck at the State's Attorney's Inquiry, and the identification of Iverson by a bloodhound.

Iverson contends, however, that since the observation of the scratch marks and the identification of him by a bloodhound occurred at the time of the State's Attorney's Inquiry, absolutely no new knowledge was received by the investigating officers to cause his arrest to be made later in the evening. Implicit in this contention is the assertion that since his ultimate arrest was based on this information, which was known to the investigating officers at the time of the State's Attorney's Inquiry, the Inquiry should have been halted and the *Miranda* warnings should have been given to him.

The record is not clear as to when the bloodhound identification took place. There is evidence that it took place during a break in Iverson's testimony at the Inquiry. However, a reading of the questions asked after this break does not indicate that Iverson was a suspect. There is also evidence that the bloodhound identification took place after the Inquiry was completed as to Iverson. If this were the case, the fact that he was released indicates that he was not a suspect. Also, a bloodhound identification at that point would have had no effect upon his testimony at the Inquiry which had just been completed.

██ As to the observation of the scratch marks, these scratches escaped the notice of the State's Attorney and the other detective present at the Inquiry. This observation alone did not take on any particular significance until it was reported after the Inquiry was completed and correlated with the other information produced by the investigation. This observation took on significance, however, when coupled with the facts that a bloodhound had identified Iverson as the source of the scent

on the pillowcase found at the scene of the crime; that the autopsies had revealed that both girls had been dead from 24 to 48 hours; that Carol died as a result of strangulation, and that Diane died as a result of manual strangulation; that Iverson in his testimony at the State's Attorney's Inquiry had admitted knocking on the door of Carol's apartment at approximately 6:00 a. m., Tuesday, November 26, 1968, which placed him at the scene of the crime within the 24-hour period in which the autopsies revealed the girls were strangled. From these facts it would be reasonable to assume that when attacked the girls would have fought with the weapons available—their hands and fingernails—and that their assailant could be expected to bear scratch marks. Without the correlation of all this information, the observation of these scratch marks by a detective and unannounced at the Inquiry did not give sufficient cause to the State's Attorney who was conducting the Inquiry to stop the Inquiry and give the *Miranda* warnings to Iverson.

The case of Commonwealth v. Fisher, 354 Mass. 549, 238 N.E.2d 525 (1968), cited by Iverson, is inapplicable here, as it can be distinguished on its facts. In *Fisher,* the police recalled a witness to explain certain discrepancies in his testimony given earlier in an investigation into the murder of a woman. During the interrogation the officers noticed scratch marks on the witness's neck. The officers immediately questioned him about the scratches and ordered him to take off his shirt, revealing more scratches. At that point the officers stopped the interrogation and advised him of his constitutional rights. The Massachusetts Supreme Court held that the investigation focused upon the witness the moment the scratches were noticed. In our case, however, although the scratch marks were noticed during his testimony at the State's Attorney's Inquiry, there is no evidence to indicate that this observation, without being correlated subsequently with all the other information,

caused the investigation to focus upon Iverson. The scratch marks were not mentioned during the Inquiry nor were they pointed out to the State's Attorney who was conducting the investigation.

The correlation of all the information gave the investigators reasonable grounds to believe that Iverson had committed the murders. But, as the State's Attorney and the other detective had failed to observe the scratch marks at the Inquiry, it was prudent that they be verified before the investigating officials concluded that they had reasonable grounds to believe Iverson had committed the murders. Once the scratch marks had been verified, reasonable grounds were established to justify arresting Iverson without a warrant pursuant to Section 29–06–20(3), N.D.C.C., which provides that:

> "29–06–20. *When private person may arrest.*—A private person may arrest another:
>
> \* \* \* \* \* \*
>
> "3. When a felony has been in fact committed, and he has reasonable ground to believe the person arrested to have committed it."

The term reasonable ground to believe that the person arrested has committed the felony is substantially equivalent to the probable-cause requirement of the Fourth Amendment to the U. S. Constitution; therefore, an arrest without a warrant made pursuant to a statute satisfies the Fourth Amendment if reasonable grounds exist. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 331, 3 L.Ed.2d 327 (1959). In *Draper* the U. S. Supreme Court held that:

> "The crucial question for us then is whether knowledge of the related facts and circumstances gave Marsh 'probable cause' within the meaning of the Fourth Amendment, and 'reasonable grounds' within the meaning of § 104(a) \* \* \* to believe that petitioner had committed or was committing a violation of the nar-

cotic laws. If it did, the arrest, though without a warrant, was lawful * * * "

In a footnote at this point the Court added:

"The terms 'probable cause' as used in the Fourth Amendment and 'reasonable grounds' as used in § 104(a) of the Narcotic Control Act, 70 Stat. 570, are substantial equivalents of the same meaning." Draper v. United States, *supra,* 79 S.Ct. 329, 331.

Accordingly, "reasonable ground to believe" the person arrested has committed a felony satisfies the "probable-cause" requirement of Section 18 of the North Dakota Constitution, as its language is virtually identical to that of the Fourth Amendment to the U. S. Constitution.

█ An arrest pursuant to a state statute providing for a citizen's arrest, although made without a warrant, is valid if "reasonable cause" exists. United States v. Montos, 421 F.2d 215, 224 (C.A.5th 1970); cert. denied 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532 (1970). This court upheld an arrest without a warrant, holding that "reasonable cause" constitutes "probable cause" within the meaning of the Fourth Amendment to the U. S. Constitution, and that as to the existence of reasonable cause, "each case must be decided on its own facts and circumstances." State v. Chaussee, 138 N.W.2d 788, 791, 792 (N.D.1965).

Iverson's testimony at his trial reveals how his arrest was made.

"A. Leo Novacek, after my second game of bowling came and tapped me on the shoulder and said, 'Mr. Alphson [the State's Attorney] would like to talk to you.' Mr. Alphson was in the building towards the street entrance and I said, 'Okay'. I went with him and Mr. Alphson said, 'Well, let's go to the basement, I have something I would like to discuss with you.' And I said, 'We could have just as well discussed them right here.'

"MR. ALPHSON: I'll object to this conversation as hearsay.

"THE COURT: The objection is sustained as to what Mr. Alphson said.

"Q. (By Mr. Rubin) Then what happened?

"A. Mr. Alphson and Mr. Novacek forced me to the basement of the Uptown.

"Q. They what?

"A. Forced me in the basement of the Uptown.

"Q. They forced you in there?

"A. Yes.

"Q. Mr. Alphson and Mr. Novacek?

"A. Yes. Novacek had a hand on his gun and said, 'If you make a move, I will shoot'.

"MR. ALPHSON: I object.

"THE COURT: Sustained.

"Q. (By Mr. Rubin) Then what happened?

"A. They took me down in the basement, shut all the doors so there would be no witnesses and took me downstairs into the basement.

"Q. Then what happened?

"A. They told me down there, Novacek had his hand on his gun and he said, 'Now we want to look at your body, take off your clothes'.

"Q. Then what happened?

"A. I said I didn't want to take them off.

"Q. Then what happened?

"A. Novacek said, 'You better, you are under arrest.'

"Q. Then what happened?

"A. I took them off when he said I was under arrest.

"Q. What happened next?

"A. They checked the scratches and told me to put my shirt back on and took me back upstairs. I told them I wanted to change from my bowling shoes to my regular shoes and Novacek followed me through where the bowlers were in bowling and to the locker room to where I changed my shoes."

\* \* \* \* \* \*

"A. Novacek brought me—followed me with his hand on his gun all the way from the locker room to the anteroom going out there and he said, 'Stand still! We have a police officer coming to pick you up.'

"Q. Then what happened?

"A. Officer Hinsz or Hinsz, I think it is—

"Q. Yes?

"A. Came in and said, 'Jim, they want you down at the police station.' And I said, 'Okay'."

At the preliminary hearing, Officer Hinsz stated that he arrested Iverson at 2000 hours, Wednesday, November 27, 1968. Iverson contends that his arrest by Officer Hinsz was unlawful, as he did not state his authority or the cause of the arrest as required by Section 29–06–17, N.D. C.C., when an officer makes an arrest without a warrant. But from Iverson's own testimony and from the testimony of Leo Novacek, it is apparent that he was arrested by the State's Attorney and his administrative assistant, and not by Officer Hinsz.

Section 29–06–02, N.D.C.C., provides that an arrest may be made by a peace officer, with or without a warrant, or by a private person. Section 29–05–10, N.D.C.C., defines peace officer as a "sheriff of a county or his deputy, or a coroner, constable, marshal, or policeman of a township, city, or village." As Iverson's arrest was accomplished by the State's Attorney and his administrative assistant (neither of whom is a peace officer within the meaning of Section 29–05–10, N.D. C.C.), it must be tested by the law governing arrest by a private person. An arrest was in fact made in this situation, since Iverson was actually restrained by the persons making the arrest.

"29–06–09. How arrest made.—An arrest is made by an actual restraint of the person of the defendant, or by his submission to the custody of the person making the arrest." N.D.C.C.

The authority for making this arrest is found in Section 29–06–20(3), N.D. C.C., as previously set forth in this opinion. The State's Attorney and his administrative assistant, as private persons, knew that a felony had been committed and had reasonable grounds to believe that Iverson had committed it. Iverson, however, contends that this arrest was unlawful, in that he was not informed of the cause of the arrest as required by Section 29–06–21, N.D.C.C.

"29–06–21. Must inform person of cause of arrest.—A private person making an arrest must inform the person to be arrested of the intention to arrest him, and of the cause of the arrest, unless:

"1. The person to be arrested then is engaged in the commission of an offense;

"2. Such person is pursued immediately after its commission or after an escape;

"3. Such person flees or forcibly resists before the person making the arrest has opportunity to inform him; or

"4. The giving of such information will imperil the arrest."

Since none of the foregoing exceptions to the statute is applicable, Iverson was entitled to be informed of the cause of his arrest. Notwithstanding that Iverson may not have been verbally informed of the cause of his arrest, we are satisfied

that the circumstances of his arrest and the State's Attorney's Inquiry conducted three hours earlier, in which Iverson testified as a witness, provided him sufficient notice of the cause of his arrest so that the objective of the statute was accomplished. Application of Kiser, 83 S.D. 272, 158 N.W.2d 596, 602 (1968), Federal Court Habeas Corpus denied 294 F.Supp. 1167, 1169 (D.C.S.D.1969), affirmed 419 F.2d 1134 (C.A.8th 1969); Schindelar v. Michaud, 411 F.2d 80, 83 (C.A.10th 1969); United States v. Baxter, 361 F.2d 116, 120 (C.A.6th 1966); Pullins v. State, 256 N.E. 2d 553, 556 (Ind.1970).

Having been lawfully arrested by private persons, Iverson was properly delivered to a peace officer, Officer Hinsz, as required by Section 29–06–23, N.D.C.C.

"29–06–23. *Arrested by private person —Duty—Taken before magistrate.*—A private person who has arrested another for the commission of a public offense, without unnecessary delay, must take him before a magistrate or deliver him to a peace officer."

Iverson contends that his arrest was nevertheless unlawful, because he was not without unnecessary delay taken before the nearest magistrate, as required by Section 29–06–25(1), N.D.C.C.

"29–06–25. *Procedure against person arrested without warrant.*—When an arrest is made by a peace officer or a private person without a warrant, the person arrested without unnecessary delay must be taken:

"1. Before the nearest or most accessible magistrate in the county where the arrest is made; * * *

\* \* \* \* \* \*

"A complaint stating the charge against the person arrested must be made before such magistrate, as is provided in section 29–05–04."

Iverson was arrested after 8:00 p. m. on Wednesday, November 27, 1968, and was not taken before the magistrate until 12:15 a. m., Thursday, November 28, 1968. At the time of his arrest, Iverson was transported to the Grand Forks police station. The scratches on his person were photographed and a physician was called to examine these scratches. Iverson was properly advised of his rights by being given the *Miranda* warnings, after which he was interrogated. A reporter recorded the entire proceeding. During this time Iverson was presented with a warrant authorizing the search of his residence and automobile and with warrants for his arrest for the first degree murders of Carol and Diane.

■ We are satisfied that this delay of approximately four hours before Iverson was brought before the magistrate was not per se unnecessary and that no prejudice resulted. United States v. Bandy, 421 F. 2d 646, 648 (C.A.8th 1970) (Delay of three days with no showing of prejudice); State v. Ramos, 11 Ariz.App. 196, 463 P.2d 91, 96 (1969) (Eleven-hour delay was held not prejudicial); Dimsdle v. State, 456 P.2d 621, 622 (Okl.Cr.1969), cert. denied 396 U.S. 966, 90 S.Ct. 446, 24 L.Ed.2d 431 (1969) (Six days' delay was not prejudicial); State v. Madison, 281 Minn. 170, 160 N.W.2d 680, 683 (1968), cert. denied 393 U.S. 1102, 89 S.Ct. 904, 21 L.Ed.2d 796 (1969) (Three and a half days' delay was not prejudicial).

Iverson, however, contends that his arrest was unlawful in that the complaints required to be made by Section 29–06–25 (1), "Procedure against person arrested without warrant", N.D.C.C., as previously set forth, were deficient in that they did not set forth the probable cause upon which his arrest was based as required by the Fourth Amendment and Section 18. Section 29–06–25(1), N.D.C.C., requires that the complaint must be made as provided in Section 29–05–04, N.D.C.C.

Section 29–05–04, N.D.C.C., reads:

"29–05–04. *Accused arrested without warrant.*—If any officer or other person shall bring any person he has arrested

without a warrant before a magistrate, it is the duty of such officer or person to specify the charge upon which he has made the arrest. It then is the duty of the magistrate or state's attorney to make a complaint of the offense charged, and to cause the officer or person, or some other person, to subscribe and make oath to such complaint and to file it."

The required contents of a complaint are set forth in Section 29–05–01, N.D.C.C., as follows:

"*29–05–01. What complaint must state.*—A complaint must state:

"1. The name of the person accused, if known, or if not known and it is so stated, he may be designated by any other name;

"2. The county in which the offense was committed;

"3. The general name of the crime or public offense committed;

"4. The acts or omissions complained of as constituting the crime or public offense named;

"5. The person against whom, or against whose property, the offense was committed, if known; and

"6. If the offense is against the property of any person, a general description of such property.

"The complaint must be subscribed and sworn to by the complainant."

Two complaints were made against Iverson by S. Duane Knutson, Chief of Police of the City of Grand Forks. One complaint charged Iverson with murder in the first degree in the death of Carol Mayers; the other charged him with murder in the first degree in the death of Diane Patricia Bill. These complaints were read to Iverson at his appearance before the magistrate. Each complaint fulfills the requirements of Sections 29–05–01 and 29–05–04, N.D.C.C., in that they name the ac-cused; designate the county in which the crime was committed; state the general name of the crime; detail the acts constituting the crime charged; name the person against whom the crime was committed; and were made under oath.

As to the constitutional requirements of a complaint, the U. S. Supreme Court in Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958) stated:

"The purpose of the complaint, then, is to enable the appropriate magistrate, here a Commissioner, to determine whether the 'probable cause' required to support a warrant exists. The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.

"When the complaint in this case is judged with these considerations in mind, it is clear that it does not pass muster. * * * The complaint contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made. * * *

" * * * the issue of probable cause had to be determined by the Commissioner, and an adequate basis for such a finding had to appear on the face of the complaint." Giordenello v. United States, *supra*, 78 S.Ct. 1245, 1250.

Later U. S. Supreme Court cases affirmed *Giordenello* in its requirement that a complaint must set forth sufficient facts so that a magistrate can judge for himself whether or not probable cause exists. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 587, 21 L.Ed.2d 637 (1969).

*Giordenello, Aguilar, Spinelli,* and State v. *Erdman,* 170 N.W.2d 872, 878 (N.D.1969) were all cases which held that the defendant's Fourth Amendment right, and in *Erdman* his Section 18 right, had been violated, and that the remedy to be applied to cure the constitutional violation was that evidence obtained as a result of a violation of the defendant's constitutional rights must be excluded from his trial.

Judged by the standards of *Giordenello,* the complaints made by Chief of Police Knutson failed to set forth sufficient information on which the magistrate could have found that probable cause existed to issue arrest warrants and to hold Iverson for a preliminary hearing or to stand trial. Had these complaints been the only source of information available to the magistrate, we would have to hold that Iverson's Fourth Amendment and Section 18 rights not to be held except "upon probable cause, supported by Oath or affirmation" had been violated.

These two complaints were used in two instances in the proceedings against Iverson. They were first used at approximately 10:30 p. m., Wednesday, November 27, 1968, when Chief of Police Knutson appeared before the magistrate, seeking two warrants for Iverson's arrest for murder in the first degree. They were used again as required by Section 29–05–04, N.D.C.C., at Iverson's first appearance before the magistrate held at 12:15 a. m., Thursday, November 28, 1968. The fact that these complaints were first used to obtain arrest warrants instead of being used to support an arrest without a warrant makes no difference, as the arrest warrants were unnecessary, Iverson having been lawfully arrested by private persons without a warrant prior to the issue of these warrants. Pillsbury v. State, 31 Wis.2d 87, 142 N.W.2d 187, 190 (1966). No evidence was obtained as the result of the issuance of these two arrest warrants.

Section 29–06–25, N.D.C.C., as previously set forth, requires that a person arrested without a warrant be brought before a magistrate without unnecessary delay and that a complaint be filed against him. Clearly, it is the intent of this statute to interpose the judgment of an independent magistrate between the judgment of a peace officer or a private person in arresting another person without a warrant and the decision to hold him for a preliminary examination or to stand trial. The fact that we have concluded that Iverson's arrest without a warrant by private persons was lawful and based on reasonable grounds to believe he had committed a felony does not alter the manner in which a magistrate must find probable cause for his arrest, or, as in this case, probable cause to hold him for a preliminary examination or to stand trial.

"An inquiry into the existence of probable cause is the same, whether made by a magistrate on application for a warrant or made by a court after an arrest or search and seizure without a warrant." United States v. Lee, 428 F.2d 917, 921, 922 (C.A.6th 1970).

Upon a review of the record, we find that the only item in evidence that can be challenged as a result of the decision of the magistrate to hold Iverson for a preliminary examination is a blood-stained handkerchief. This handkerchief was seized from Iverson as he was being booked into the county jail following his first appearance before the magistrate at 12:15 a. m., Thursday, November 28, 1968, wherein the magistrate found probable cause to order Iverson confined without bail for two counts of murder in the first degree pursuant to Section 29–08–05, N.D.C.C.

"*29–08–05. Bail upon charge of murder in first degree.*—Bail by sufficient sureties may be admitted upon arrest in a criminal action when the offense is murder in the first degree unless the proof of guilt is evident or the presumption thereof great. In such action, bail shall be taken only by the supreme court or a judge thereof, and the taking there-

of shall be discretionary, regard being had to the nature and circumstances of the offense and to the evidence and to the usages of law. * * * "

As to all the other evidence, the evidence obtained pursuant to the search warrant was not tainted by Iverson's first appearance before the magistrate, as the search warrant was based on affidavits setting forth probable cause independent of and prior to his appearance before the magistrate. The record of the interrogation of Iverson after his arrest and after he had been given the *Miranda* warnings was used at his trial for purposes of impeachment. This record of interrogation was likewise not tainted, as it was obtained prior to his appearance before the magistrate and his rights were safeguarded. The record clearly indicates that Iverson was advised of his constitutional rights as set forth in *Miranda*, and that he executed a voluntary waiver of these rights and agreed to submit to interrogation. Here, however, unlike the testimony at the State's Attorney's Inquiry, the only constitutional objection to the use of this testimony is that it was the product of an unlawful arrest.

Because we have found that there were reasonable grounds to believe Iverson had committed the felony of murder in the first degree, which is to say that probable cause existed for his arrest under the Fourth Amendment and Section 18, and that the procedures for his arrest by private persons without a warrant were substantially complied with, we conclude that this testimony was obtained pursuant to a lawful arrest and not as a result of his first appearance before the magistrate.

Therefore, if we were to hold that Iverson was held at his first appearance before the magistrate in violation of his rights under the Fourth Amendment and Section 18 due to the failure of the complaints to set forth sufficient grounds upon which the magistrate could find probable cause, the only evidence that should have been excluded was the handkerchief. Nevertheless, notwithstanding the insufficiency

of the complaints, we are satisfied that the magistrate had sufficient information to find that probable cause existed to hold Iverson on two counts of murder in the first degree.

■ When Iverson appeared before the magistrate at 12:15 a. m., the magistrate had already found probable cause to issue a search warrant at a proceeding held one hour and forty-five minutes earlier. Although we will subsequently discuss the sufficiency of the affidavits praying for a search warrant, we are satisfied that these two affidavits set forth sufficient information to support a finding of probable cause. These affidavits are part of the record of this case. The magistrate, having found probable cause to issue the search warrant based on these affidavits, necessarily had knowledge of the information contained in these affidavits, which, together with the two complaints which in themselves failed to set forth sufficient information, was sufficient to support a finding of probable cause to hold Iverson for a preliminary examination. On review, not only of the complaints but also of the affidavits, we conclude that the magistrate had sufficient information to find probable cause to hold Iverson for a preliminary examination.

■ His arrest having been lawful, the handkerchief seized from him at the time of his being booked, and after his first appearance before the magistrate, was properly admitted in evidence at his trial as evidence seized incident to a lawful arrest, the search having been limited solely to his person. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969), rehearing denied 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969).

■ We note that no pre-trial motion was made to suppress this handkerchief and that no objection was made when it was admitted in evidence at Iverson's trial. Failure to make such timely motions waives the objection to the admissibility of the evidence. Jones v. United States, 362 U.S.

257, 80 S.Ct. 725, 736, 737, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960); Mesmer v. United States, 405 F.2d 316, 318 (C.A.10th 1969); Kuhl v. United States, 370 F.2d 20, 21 (C.A.9th 1966). We note also that the evidence provided by the bloodstains on this handkerchief was merely cumulative, as bloodstains of the same blood type were found on another item of evidence seized pursuant to the search warrant.

The search warrant presented to Iverson after his arrest authorized the search of his automobile and residence in daytime or nighttime for "ladies' garments either torn or with blood stains on them, ladies' purses, identification for Carol Mayers * * *" Pursuant to this search warrant, Iverson's automobile and his residence were searched. The officers conducting the search at his residence seized a pair of trousers, a coat, and a towel. These items along with the handkerchief previously mentioned were admitted in evidence at Iverson's trial.

Through expert testimony it was established that Carol belonged to blood group type B and that Diane belonged to blood group type A. Iverson testified that he belonged to blood group type A.

Expert testimony established that blood stains found on the handkerchief belonged to blood group type B; that blood stains found on the trousers were of both blood group types A and B; that blood stains on the towel belonged to blood group type A; and that no blood stains were found on the coat. Expert testimony further established that hairs from Diane were found on the trousers and the towel, and that hairs from Carol were found on the trousers, the towel, and the coat.

Iverson contends that these items seized pursuant to the search warrant should not have been admitted in evidence, because the affidavits in support of the search warrant did not sufficiently establish probable cause as required by the Fourth Amendment and Section 18; that the affidavits did not describe with sufficient particularity the items to be seized as required by the Fourth Amendment and Section 18; that the search warrant authorized a search for property other than that permitted by Section 29-29-02, N.D.C.C.; and that the search warrant authorized a nighttime search in violation of Section 29-29-10, N.D.C.C., because the affidavits did not state that the property to be seized was positively located in the place to be searched.

The search warrant was issued by the magistrate at approximately 10:30 p. m., Wednesday, November 27, 1968, upon two affidavits sworn to by two officials engaged in the investigation of the deaths of Carol and Diane. The Fourth Amendment to the U.S. Constitution reads: " * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized." Section 18 of the North Dakota Constitution contains similar language.

The U.S. Supreme Court in affirming a search warrant authorizing search for an illegal distillery held that to establish probable cause as required by the Fourth Amendment,

" * * * affidavits for search warrants * * * must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude * * * toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

" * * * Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. * * * Although in a particular case

it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

The affidavits in the present case are not burdened by elaborate specificity, and it is obvious that they were prepared in the midst and haste of a criminal investigation. However, when judged in a common-sense and realistic fashion, with any doubt being resolved in favor of upholding the search warrant, the affidavits in this case established the necessary probable cause, thereby justifying the issuance of the search warrant.

 The affidavits, when read together, establish that Carol Mayers and Diane Patricia Bill had been murdered; that Iverson knew Carol and that he had visted her in her apartment on several occasions, the most recent visit being two days before the discovery of the bodies of Carol and Diane; that Iverson on the day of the discovery of the murder victims was interrogated and that scratch marks were noticed on his neck, hand, and body; and that Iverson drove a cab and would on occasion give Carol a ride to work.

Although this information is sketchy, when judged in a common-sense fashion it does establish probable cause. It is reasonable to assume that in a violent crime such as murder there would be blood present, and that female victims would fight with the weapons available to them—their hands and fingernails. Accordingly, it would be reasonable to assume that their assailant would bear scratch marks. Hence, it would be reasonable to further assume that Iverson, who knew one of the victims and had visited her apartment, with the most recent visit having been two days before the discovery of the bodies of the victims, and who bore scratch marks on his hand, neck, and body, could be the assailant.

Furthermore, it would be reasonable to assume that Iverson would have driven his automobile to his residence to clean up and to change out of any blood-stained clothing, and that, accordingly, evidence could be expected to be found in his automobile or his residence.

The facts asserted in the affidavits justified the issuance of the search warrant in that they disclosed probable cause to believe that Iverson committed the crime of murder and that evidence sought to be obtained by a search could reasonably be expected to be found in Iverson's residence or in his automobile.

We note that the State alleges in its brief that the two affidavits praying for the search warrant were presented to the magistrate in the same proceeding in which Chief of Police Knutson presented his complaints. Had there been a record of this entire proceeding, we could have found that the magistrate had sufficient facts to find probable cause to hold Iverson, since the affidavits praying for the search warrants established probable cause not only for the issuance of the search warrant, but to hold Iverson for the crime of murder.

Iverson cites *Spinelli* to demonstrate the insufficiency of the affidavits in this case. *Spinelli,* however, is distinguishable on its facts, as the affidavit in *Spinelli* was largely based on unsupported information provided by a "confidential reliable informant" and the conclusory allegation that Spinelli himself was a "known" gambler. In the present case, the affidavits were made by officials who had personally taken part in the investigation and whose affidavits simply reported their own observations and the results of their investigation, reciting only facts and not conclusions.

 As to the search warrant there is no allegation that the places to be searched (Iverson's automobile and residence) were not described with sufficient particularity. Rather, Iverson contends that the description in the affidavits and the search war-

rant of the property to be seized lacked sufficient particularity to allow seizure of the towel. No allegation is made that the coat and trousers were not described with sufficient particularity. We are satisfied that the coat and trousers fall within the description of "men's garments either torn or with blood stains on them" and, accordingly, we hold that the coat and trousers were properly seized under the search warrant.

Iverson contends, however, that these items were nevertheless inadmissible in that they were seized in violation of Section 29–29–02, N.D.C.C.

*"29–29–02. Grounds for issuance of search warrant.*—A search warrant may be issued upon any of the following grounds:

"1. When property is stolen or embezzled, it may be taken on a search warrant from any house or other place in which it is concealed, or from the possession of the person by whom it was stolen or embezzled, or of any other person in whose possession it may be;

"2. When it was used as the means of committing a felony, it may be taken on the warrant from any house or other place in which it is concealed, or from the possession of the person by whom it was used in the commission of the offense, or of any other person in whose possession it may be;

"3. When it is in the possession of any person with the intent to use it as the means of committing a public offense, or in the possession of another to whom he may have delivered it for the purpose of concealing it or preventing its being discovered, it may be taken on the warrant from such person, or from a house or other place occupied by him or under his control, or from the possession of the person to whom he may have delivered it."

The State contends that these items were properly admitted in evidence, since they were used as the means of committing a felony. Iverson strongly resists this contention and claims that these items were "mere evidence" and, accordingly, could not be seized.

██ The U.S. Supreme Court in Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) answers the contention of both parties. In *Warden* certain items of clothing were admitted in evidence, having been seized incident to a lawful arrest without a warrant.

"We come, then, to the question whether, even though the search was lawful, the Court of Appeals was correct in holding that the seizure and introduction of the items of clothing violated the Fourth Amendment because they are 'mere evidence.' The distinction made by some of our cases between seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband has been criticized by courts and commentators. * * * We today reject the distinction as based on premises no longer accepted as rules governing the application of the Fourth Amendment." Warden, Maryland Penitentiary, *supra,* 87 S.Ct. 1642, 1646, 1647.

Hence, the claim that an item was simply "mere evidence" and therefore inadmissible is no longer a useful objection.

██ The U.S. Supreme Court in *Warden* also held that the items of clothing seized were properly admitted in evidence, implicitly, as instrumentalities of a crime.

"The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause

to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required. * * * But no such problem is presented in this case. The clothes found in the washing machine matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit." Warden, Maryland Penitentiary v. Hayden, *supra,* 87 S.Ct. 1642, 1650.

In accord with this decision that items of clothing can be instrumentalities of a crime are United States v. Alloway, 397 F.2d 105, 110, 111 (C.A.6th 1968), and United States v. Garris, 262 F.Supp. 175 (D.C.D.C.1966). We agree that items of clothing can be instrumentalities in the commission of a crime; that is to say, they can be means of committing a felony. Accordingly, the coat and trousers were lawfully seized under Section 29–29–02(2), N.D.C.C., as previously set forth.

■ Property used as a means of committing a felony is not limited solely to the weapon used in the commission of a crime, but it includes property used in preparation for the crime, property used in the commission of the crime, and property used after the commission of the crime to attempt escape or to cover up the crime. State v. Spicer, 473 P.2d 147, 150, 151 (Or.App. 1970) (narcotics paraphernalia were lawfully seized, although not described in search warrant, since they establish probable cause to believe that a crime is being or has been committed); Edelin v. United States, 227 A.2d 395, 397 (D.C.App.1967) (narcotics paraphernalia, although not described in the search warrant, were lawfully seized since they may be used as the instrumentalities of committing a crime); United States v. Bowe, 360 F.2d 1, 13 (C.A.2d 1966), cert. denied 385 U.S. 961, 87 S.Ct. 401, 17 L.Ed.2d 306 (1966) (planks of wood, long spike nails, bottles, cotton wadding, a funnel and two plastic containers of gasoline and benzene were lawfully seized pursuant to a search warrant, since they were to be used by a conspiracy for training to blow up the Statue of Liberty); Palmer v. United States, 92 U.S. App.D.C. 103, 203 F.2d 66, 67 (1953) (pistol not described in search warrant was lawfully seized because it could be used by the person to effect his escape); United States v. Garris, *supra,* 262 F.Supp. 175, 176, 177 (clothing and keys although not described in search warrant were lawfully seized because they were used as instrumentalities by which rapist effected his escape from the scene of the crime). Property used in any of these three stages in the commission of a crime is of equal significance.

■ We have concluded that it would have been reasonable to assume that Iverson would have returned to his residence to clean up and change out of any blood-stained clothing. It would also be reasonable to assume that in the process of cleaning up he would have used a towel to wipe any blood off his person. A towel used in this manner is a means of committing a felony, since it aids in destroying evidence of the commission of a crime.

■■ The only question remaining as to the seizure of the towel is whether it was unlawfully seized, since the description of items to be seized in the search warrant cannot be construed to include the towel. We are satisfied, however, that even though evidence is not described in the search warrant with sufficient particularity, it may nevertheless be lawfully seized and admitted in evidence if it was stolen property, property used as the means of committing a felony, or property which is in the possession of any person with the intent to use it as a means of committing a felony, which is to say, property the possession of which is a crime. Warden, Maryland Penitentiary v. Hayden, *supra,* 87 S.Ct. 1642, 1648 (fruits of a crime, instrumentalities, or contraband can be lawfully seized in a search without a warrant incident to an

arrest); Johnson v. United States, 110 U.S. App.D.C. 351, 293 F.2d 539, 540 (1961), cert. denied 375 U.S. 888, 84 S.Ct. 167, 11 L.Ed.2d 118 (1963) (stolen credit card seized incident to a search under a search warrant which did not describe the credit card was lawfully seized and admitted in evidence as an instrumentality of a crime. "An officer engaged in a lawful search is not confined to seizing only items described in the warrant, especially where the unlisted items seized are instrumentalities of a crime."); United States v. Alloway, *supra,* 397 F.2d 105, 111 (several suits were lawfully seized and admitted in evidence as instrumentalities of a crime, although the language of the search warrant authorized only the seizure of a certain sum of stolen money and "any weapon used in said robbery."); United States v. Robinson, 287 F.Supp. 245, 250, 254 (D.C.N.D. Ind.1968) (clothes and shell casings were lawfully seized and admitted in evidence as instrumentalities of a crime under a search warrant that authorized the seizure of "certain instrumentalities used in the commission of the robbery and murder * * *"); United States v. Garris, *supra,* 262 F.Supp. 175, 176 (although not described in the search warrant several items of clothing were lawfully seized and admitted in evidence as instrumentalities of a crime); Ludwig v. State, 215 So.2d 898, 900 (Fla. App.1968), cert. denied 396 U.S. 927, 90 S.Ct. 261, 24 L.Ed.2d 225 (1969), rehearing denied 396 U.S. 1030, 90 S.Ct. 546, 24 L.Ed.2d 527 (1970) (property seized pursuant to a search warrant, although not described in the warrant, was lawfully seized and admitted in evidence as stolen property); United States v. Eisner, 297 F.2d 595, 597, (C.A.6th 1962), cert. denied 369 U.S. 859, 82 S.Ct. 947, 8 L.Ed.2d 17 (1962) (stolen furs seized pursuant to a search warrant describing different stolen furs were lawfully seized); Aron v. United States, 382 F.2d 965, 973, 974 (C.A.8th 1967) (stolen postage stamps were lawfully seized pursuant to a search warrant that only authorized the seizure of stolen savings stamps). Accordingly, the towel, although not described with sufficient particularity in the search warrant, was lawfully seized and admitted in evidence as a means of committing a felony.

To hold otherwise would be to unduly encumber the particularity requirement of the Fourth Amendment and Section 18. In a search incident to a lawful arrest, based on probable cause and limited to the immediate area surrounding the person at the time of his arrest, evidence may be lawfully seized if it is stolen property, the instrumentality of a crime, or property the possession of which is a crime. A contrary rule as to searches pursuant to a search warrant issued by an independent magistrate on his own finding of probable cause would defeat the constitutional preference for search warrants.

"Instead of preferring search warrants, a rule limiting seizure under them to the items enumerated in the description would relegate them to a secondary status, if not an anachronism in the law. * * * While it might be possible to describe some of the things sought with sufficient particularity to satisfy a conscientious magistrate, it will never be possible to forecast with any exactitude the items which such a search might reveal. The only reasonable rule * * * is that officers conducting a lawful search pursuant to a search warrant may seize any fruits, instruments or evidence of crime which they might uncover. A warrant must still specifically describe the place to be searched and the things to be seized, and the search must be directed toward the things so described, but if in the course of that search they discover items not named in the warrant which might have been seized in a search incident to an arrest, they may also be seized in a search pursuant to a search warrant." United States v. Robinson, *supra,* 287 F.Supp. 245, 254.

The only question remaining as to the search warrant is whether it was issued in violation of Section 29–29–10, N.D.C.C.

*"29-29-10. Search warrant to be served in daytime—Exception.*—The magistrate issuing a search warrant must insert a direction in the warrant that it be served in the daytime, unless the affidavits are positive that the property is on the person or in the place to be searched. In that case he may insert a direction that it be served at any time of the day or night."

Neither affidavit praying for the search warrant states positively that the property to be seized is in the place to be searched. Accordingly, we must hold that the search warrant was issued and executed in violation of Section 29-29-10, N.D.C.C. Since this particular right to be free from nighttime searches, except under certain conditions, is a statutory right rather than a constitutional right under the Fourth Amendment or Section 18, the question is what is the effect of this statutory violation?

We note that Rule 41(c) of the Federal Rules of Criminal Procedure, Title 18, U.S.C.A., contains language similar to Section 29-29-10, N.D.C.C., in that a search warrant may not contain a direction to serve it in either the daytime or nighttime unless the affidavit is positive that the property is at the place to be searched. In Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) the U.S. Supreme Court held that a daytime search warrant executed at night constituted an illegal search and seizure. In *Jones* federal alcohol agents, after obtaining a daytime warrant, delayed their search until after dark when a truck pulled up to an illicit distillery to load up. The federal agents arrested the persons at the truck and forced their way into the distillery located in a private home to conduct their search. The U.S. Supreme Court stated that the purpose of Rule 41 was to implement the Fourth Amendment and that "it is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home that occurred in this instance." Jones v. United States, *supra,* 78 S.Ct. 1253, 1257.

As to the protection of the Fourth Amendment, the U.S. Supreme Court has held that "the Fourth Amendment protects people, not places." Katz v. United States, *389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576* (1967).

The most recent federal case dealing with the problem of a nighttime search under Rule 41(c) is United States v. Ravich, 421 F.2d 1196 (C.A.2d 1970), cert. denied 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). In *Ravich,* State police officers arrested two men and a woman in Louisiana for a robbery they had committed in New York. The woman was arrested while driving a car. Upon questioning, she told the police that the two men were in a motel and had a great deal of money hidden there. The officers went to the motel and arrested the two men. They did not search the room incident to the arrest, but guards were posted at the entrance to the motel rooms. Later in the evening the officers, upon affidavits showing probable cause, obtained a search warrant which did not contain a direction that it could be executed in the nighttime. Nevertheless, the officers returned to the motel rooms and searched them during the nighttime. Despite the fact that the search was executed in violation of Rule 41(c), the evidence obtained from the search was held to have been lawfully seized. United States v. Ravich, *supra,* 421 F.2d 1196, 1199, 1200.

The U.S. Court of Appeals in *Ravich* held that "under the special circumstances of this case the defects in the warrant were not such as to require exclusion of the evidence seized under them." United States v. Ravich, *supra,* 421 F.2d 1196, 1201. These special circumstances included the U.S. Court of Appeals' determination that the affidavits met the probative standards of Rule 41 authorizing a nighttime search and that the Judge must have known that the warrant might be executed at night. United States v. Ravich, *supra,* 421 F.2d

1196, 1201. We note, however, that the special circumstances must have also included the fact that Ravich and his companions were already in custody as the result of a lawful arrest; that the Fourth Amendment protects people, not places; that there was no one in the motel rooms when the search was made; and that the same result would have been obtained if the officers had delayed their search until daylight.

 We conclude that the Fourth Amendment and, correspondingly, Section 18 protect people and not places. Similarly, we conclude that the purpose of Section 29–29–10, N.D.C.C., is to protect a person and not a place from "the peculiar abrasiveness of official intrusions at such periods" (United States v. Ravich, *supra*, 421 F.2d 1196, 1201).

Iverson's privacy during the evening could not have been invaded by a search of his residence pursuant to a search warrant issued on affidavits that lacked the positive statement required by Section 29–29–10, N.D.C.C., because he was incarcerated at the time of the search warrant pursuant to his lawful arrest. Therefore, the authorization of a nighttime search of Iverson's residence was harmless error.

Our holding that this violation of Section 29–29–10, N.D.C.C., was harmless error as to Iverson is supported by the U. S. Supreme Court in Chapman v. State of California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705, 24 A.L.R.3d 1065 (1967), rehearing denied 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed. 2d 241 (1967). In *Chapman* the U.S. Supreme Court held that "the application of a state harmless-error rule is, of course, a state question where it involves only errors of state procedure or state law." Chapman v. State of California, *supra*, 87 S.Ct. 824, 826. We have previously held in this opinion that this was a statutory and not a constitutional violation. Accordingly, it is proper to apply our State harmless-error rule.

We are required by Section 29–28–26, N.D.C.C., to disregard such errors on appeal.

"29–28–26. *Technical errors to be disregarded on appeal.*—After hearing an appeal, the supreme court must give judgment without regard to technical errors or defects or exceptions which do not affect the substantial rights of the parties."

Accordingly, we hold that the items seized pursuant to the nighttime search of Iverson's residence were properly admitted in evidence at his trial.

"All 50 States have harmless-error statutes or rules, and the United States long ago through its Congress established for its courts the rule that judgments shall not be reversed for 'errors or defects which do not affect the substantial rights of the parties.' * * * None of these rules on its face distinguishes between federal constitutional errors and errors of state law or federal statutes and rules. All of these rules, state or federal, serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We conclude that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Chapman v. State of California, *supra*, 87 S.Ct. 824, 827.

Iverson alleges that he was denied the assistance of counsel at his preliminary examination held pursuant to Chapter 29–07, N.D.C.C., because he was not mentally competent at the time of the preliminary examination to assist in his own defense. The record clearly indicates that Iverson was represented by appointed counsel at the preliminary examination held on January 21, 1969, and at all proceedings before the magistrate held on and after December

2, 1968. However, Iverson contends that he was nevertheless denied the assistance of counsel since he was not mentally competent to assist his counsel in his own defense.

At Iverson's appearance before the magistrate on December 2, 1968, the State moved that Iverson be committed to the State Hospital in Jamestown for a mental examination to determine whether he was capable of assisting in his own defense, since Iverson had a history of mental illness. A ruling on the motion was postponed to allow the magistrate time to consider it. Subsequently, at a hearing held on December 6, 1968, the magistrate denied the State's motion to commit Iverson to the State Hospital in Jamestown, but granted the State leave to amend the motion to provide that the mental evaluation be conducted in Grand Forks by two experts, and thereafter granted the motion as amended.

Iverson was evaluated by a psychologist and a psychiatrist from the Northeast Region Mental Health Institute. Their reports, dated December 12, 1968, both concluded that Iverson was not competent to understand the nature of the proceedings against him and was not able to assist in his own defense. As a result of these reports, the State, at an appearance before the magistrate held on December 16, 1968, renewed its motion to commit Iverson to the State Hospital in Jamestown for a mental evaluation. The magistrate, however, denied the motion, holding that this stage of the proceedings was not a trial, that only a trial court could commit a defendant to the State Hospital in Jamestown pursuant to Section 29–20–01, N.D.C.C., and that a preliminary examination must be held to allow the defendant and his counsel to examine the State's case and to allow the public to hear the facts upon which the State had commenced a case against the defendant.

The preliminary examination was subsequently held on January 21, 1969. At the close of the examination, Iverson was bound over to the district court to stand trial. After being bound over to the district court, Iverson was committed by the district court to the State Hospital in Jamestown for a mental examination to determine his competence to understand the nature of the proceedings and his ability to aid in his own defense. He was returned to the district court after an evaluation, in which he was found to be competent to understand the nature of the charges against him and capable of assisting his counsel in his own defense. No further question was raised by either the State or the defense as to Iverson's competence until after the verdicts were rendered and the sentences imposed. It was conceded by his counsel on appeal, in oral argument, that Iverson had been examined at the State Hospital in Jamestown before his trial and that he was found to be mentally competent to stand trial.

The U. S. Supreme Court in Coleman v. Alabama, 399 U.S. 1, 90 S.Ct. 1999, 2003, 26 L.Ed.2d 387 (1970), held that the preliminary examination is a "critical stage" at which the defendant must be afforded the right to counsel. We have noted that Iverson was provided with counsel at his preliminary hearing and at all proceedings held on and after December 2, 1968, as required by Section 29–07–01(4), N.D.C.C., and Section 29–07–04, N.D.C.C.

The U. S. Supreme Court, however, in Dusky v. United States, 362 U.S. 402, 80 S. Ct. 788, 789, 4 L.Ed.2d 824 (1960), held that simply having counsel is not enough, that a mentally defective defendant cannot be found to be competent to stand trial unless "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and unless "he has a rational as well as factual understanding of the proceedings against him."

■ It was proper for the magistrate to have Iverson examined by the psychologist and psychiatrist in Grand Forks. Section 29–20–01, N.D.C.C., provides that:

"29–20–01. *Examination of defendant's mental condition to determine whether he shall be tried.*—If, before or during the trial, the court has reasonable ground to believe that the defendant against whom an indictment has been found or an information filed is insane or mentally defective to the extent that he is unable to understand the proceedings against him or to assist in his defense, the court immediately shall fix a time for a hearing to determine the defendant's mental condition. The court may appoint two disinterested qualified experts to examine the defendant with regard to his present mental condition and to testify at the hearing, or it may commit the defendant to the state hospital at Jamestown or the state school at Grafton for observation and examination regarding his present mental condition. The proper officer of such institution shall present to the court which conducted the hearing a report regarding the defendant's present mental condition. He also may be summoned to testify at the hearing. Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party."

The magistrate erred, however, when he failed to immediately fix a time for a hearing to determine Iverson's mental condition, as required by Section 29–20–01, N.D.C.C. This error was compounded when he proceeded to hold a preliminary hearing while he had before him two reports indicating that Iverson was not capable of understanding the nature of the charges against him or assisting in his own defense, thereby raising the inference that he was denied the assistance of counsel under the standards of *Dusky*.

■ With *Coleman*, the statutory right to counsel at a preliminary examination provided by Sections 29–07–01 and 29–07–04, N.D.C.C., has been upgraded to a constitutional right to have the assistance of counsel at a critical stage of the proceedings against the defendant. What we said in State v. Starratt, 153 N.W.2d 311 (N.D.

1967), to the effect that a preliminary hearing is not a critical stage, has been overruled by *Coleman*.

*Coleman* was decided on June 22, 1970, after this case had been tried and the sentence imposed, and after this appeal had been taken. The U. S. Supreme Court has not yet passed on the retroactive effect of *Coleman*; but notwithstanding any retroactive effect it may have, we are satisfied that the magistrate's error was harmless under *Chapman*. "The test to be applied is whether the denial of counsel at the preliminary hearing was harmless error under Chapman v. California * * *" Coleman v. Alabama, *supra*, 90 S.Ct. 1999, 2004.

We have noted earlier in this opinion "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." Chapman v. State of California, *supra*, 87 S.Ct. 824, 827.

■ Upon a review of the record, we are satisfied that Iverson was not prejudiced by the magistrate's decision to conduct a preliminary examination despite the fact that evidence existed that Iverson was not able to assist in his own defense or to understand the nature of the charges against him. Iverson was represented by counsel at the preliminary examination. Iverson was not called upon to testify or present a defense. No statements were made by him. He was given the opportunity to discover the State's entire case against him. His counsel used this opportunity to conduct a vigorous discovery of the State's case through extensive and probing cross-examination, raising many objections to the admission of the State's evidence, while at the same time leaving his own case undisclosed. This proceeding was not a trial; rather, it was simply a proceeding to determine whether probable cause existed to hold him to stand trial.

The reports of the local psychiatrist and psychologist do not prove that Iverson was incompetent to understand the nature of the proceedings against him or to aid in his own defense. The reports are merely evidence to be considered in light of the report from the superintendent of the State Hospital to the contrary. The evaluation of Iverson at the State Hospital in Jamestown, which resulted in his being found mentally competent to stand trial, was made over a period of several weeks while Iverson was committed for an evaluation of his mental condition. Contrastingly, the report of the Grand Forks psychiatrist was based on one interview conducted in the county jail. There is no indication as to the time involved in interviewing Iverson for the psychologist's report, but at the most he could have observed Iverson only from December 6, 1968, to December 12, 1968.

From our examination of the transcript of the preliminary examination, we are satisfied beyond a reasonable doubt that Iverson was not prejudiced by the failure of the magistrate to make a finding as to his competency prior to the preliminary examination. Accordingly, the error was harmless and will be disregarded under Section 29–28–26, N.D.C.C.

Iverson next contends that he was denied the effective assistance of counsel, since his trial counsel was ineffective, incompetent, and inadequate in that he failed to move to suppress the evidence obtained as a result of the search of Iverson's residence pursuant to a search warrant. In Smith v. Woodley, 164 N.W.2d 594, 597 (N.D.1969), this court held "that if counsel at the trial is so inadequate as to be equal to no counsel at all, a judgment may be rendered void * * *" This court further held that:

"The books in the law libraries are replete with cases alleging incompetency or ineffective assistance of counsel at trial. These cases uniformly hold that the proof of the effectiveness of such assistance lies in the character of the resultant proceedings, and unless the purported representation by counsel was such as to make the trial a farce and mockery of justice, mere allegations of incompetent or ineffective counsel ordinarily will not suffice as grounds for the issuance of a writ of habeas corpus or for the reversal of a conviction." Smith v. Woodley, *supra*, 164 N.W.2d 594, 597.

Federal courts have made similar holdings. Borchert v. United States, 405 F.2d 735, 738 (C.A.9th 1968), cert. denied 394 U.S. 972, 89 S.Ct. 1466, 22 L.Ed.2d 753 (1969); United States v. Long, 419 F.2d 91, 94 (C.A.5th 1969); Kruchten v. Eyman, 406 F.2d 304, 312 (C.A.9th 1969); Cross v. United States, 392 F.2d 360, 366 (C.A.8th 1968).

We have previously held in this opinion that the evidence seized from Iverson's residence pursuant to a search warrant was lawfully and properly seized. Iverson's claim that his trial counsel was incompetent and inadequate because he failed to move to suppress this evidence is without merit. Counsel is not incompetent because he fails to move to suppress evidence which had been lawfully seized. In Argo v. United States, 378 F.2d 301, 303 (C.A.9th 1967), cert. denied 390 U.S. 907, 88 S.Ct. 823, 19 L.Ed.2d 874 (1968), the U. S. Court of Appeals held that a trial counsel was not incompetent for failing to object to evidence seized in a lawful search. In accord are Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281, 286 (1967) and United States v. Meyer, 417 F.2d 1020, 1023, 1024 (C.A.8th 1969).

Iverson asserts that the trial court erred in allowing ten color photographs of the victims to be received in evidence. These photographs show the victims laid out at the mortuary prior to the autopsy. They were properly identified by the pathologist, under whose direction they were taken. The pathologist testified that he knew the cause of the deaths of Carol and Diane and that his conclusions were formed without the aid of the photographs, but that each of

the ten photographs showed something that he must point out in his testimony.

Iverson, however, argues that the defense did not dispute the cause of death and that the pathologist could have testified to his conclusions without the use of the photographs, and that projecting the photographs on a screen, which greatly enlarged them, served no purpose other than to inflame the minds of the jurors and arouse their passion and prejudice.

■ It appears to be a well-settled rule that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in question, are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, condition and identification of the body, even though such photographs may have the additional effect of tending to excite the emotions of the jury. 23 C.J.S. Criminal Law § 852(1)c (1961); 29 Am. Jur.2d Evidence §§ 785–788, 798 (1967); 159 A.L.R. 1413, 73 A.L.R.2d 769. See also, recent cases: State v. Austin, 84 S.D. 405, 172 N.W.2d 284 (1969); People v. Brawley, 1 Cal.3d 277, 82 Cal.Rptr. 161, 461 P.2d 361 (1969); State v. Martinez, 92 Idaho 183, 439 P.2d 691 (1968); People v. Terry, 2 Cal.3d 362, 85 Cal.Rptr. 409, 466 P.2d 961 (1970); People v. Robles, 2 Cal.3d 205, 85 Cal.Rptr. 166, 466 P.2d 710 (1970); People v. Ellison, 121 Ill.App. 2d 149, 257 N.E.2d 199 (1970); State v. Adams, 76 Wash.2d 650, 458 P.2d 558 (1969).

A South Dakota case raised the question of admissibility of photographs of the victims taken prior to and during the course of an autopsy. State v. Zobel, 81 S.D. 260, 134 N.W.2d 101 (1965), cert. denied 382 U.S. 833, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965). The South Dakota court, in affirming a conviction of manslaughter by child abuse, held that the trial court did not abuse its discretion when it admitted in evidence photographs and slides of the children.

The slides were shown on a screen for the jury to view.

"There was no indication they were distorted or did not portray an accurate representation of the deceased children. Photographs, slides and X-rays are admissible when they accurately portray anything which it is competent for a witness to describe in his own words, or where they are helpful as an aid to a verbal description of objects or conditions and relevant to some material issue. They are not rendered inadmissible merely because they vividly bring to jurors details of a crime or incidentally tend to arouse passion and prejudice. They are a common and recognized medium in this day for depicting events." State v. Zobel, *supra*, 134 N.W.2d 101, 111.

The use of photographs in criminal trials has been previously upheld by this court. It is largely within the discretion of the trial court. State v. Gill, 154 N.W.2d 791, 798 (N.D.1967); State v. Jager, 85 N.W.2d 240, 244 (N.D.1957). In State v. Gulke, 76 N.D. 653, 38 N.W.2d 722 (1949), we held that in a prosecution for manslaughter a photograph taken at the scene of the accident, showing the body of the deceased lying beside the car which struck and killed him, constituted visual material evidence of the homicide and the instrument of death, and was admissible in evidence over the objection that it had a tendency to arouse the prejudice of the jury.

"This photograph is material to the charge set forth in the information. It was admitted as a part of the state's case. The defendant had plead not guilty and at the time of the introduction had not testified or in any way admitted the homicide. While not pleasing to the eye it is not particularly gruesome. It is visual evidence of the homicide and of the car which was the instrument of death and was properly received in evidence." State v. Gulke, *supra*, 38 N.W.2d 722, 725.

The primary case relied upon by Iverson is People v. Turner, 17 Mich.App. 123, 169 N.W.2d 330 (1969). The Michigan Appellate Court reversed a murder conviction and remanded the case for new trial on the ground that the admission into evidence of color photographs of the victim taken during the course of autopsy was an abuse of discretion. The court found that, although an autopsy was required for the doctor to ascertain the nature and extent of the injury, a photograph taken during the autopsy was not required for him to adequately and effectively describe his findings to the jury. The photograph showed the victim's bloody body and head cut apart by the autopsy and surrounded by laboratory instruments.

"Photographs taken during an autopsy, however, must be subjected to more careful scrutiny. To persons unaccustomed to such sights, they are even more gruesome and revolting than the goriest external photographs. In addition, they depict the corpse as it is left, not by its assailant, but by the probing instruments and procedures of the medical examiner." People v. Turner, *supra*, 169 N.W.2d 330, 335.

The ten color photographs in question, unlike the photograph in *Turner*, are external photographs taken prior to the internal probing of a pathologist in the course of the autopsy. The unpleasant appearance of the victims in these photographs is not due to the work of the pathologist; rather, it is the result of the manner in which the murders were perpetrated and the subsequent decomposition of the bodies prior to their discovery.

We are satisfied that the trial court did not abuse its discretion in admitting these ten color photographs in evidence. They were used to aid the pathologist in presenting his testimony; hence, they were of significant evidentiary value. Furthermore, the trial court sought to mitigate any inflammatory effect of these photographs by giving the jurors a cautionary instruction

as to these photographs. We conclude, accordingly, that no error was committed with respect to the admission in evidence of the ten color photographs.

Iverson next contends that the trial court erred when it permitted the order of proof to be changed. Iverson took the stand at his trial to testify on his own behalf. On cross-examination, the State sought to impeach Iverson by reading from the transcript of the interrogation to which Iverson submitted after his arrest. Iverson's trial counsel objected to the use of this transcript of the interrogation. The State then marked an exhibit for identification which purported to be a statement of rights signed by Iverson prior to his interrogation after his arrest. The exhibit was shown to Iverson and he was asked to identify his signature. Iverson first denied that it was his signature, but later stated that he couldn't be sure it was his. Iverson was technically correct, since the exhibit was a photocopy and not the original statement of rights. The State then asked that several officers, who had witnessed Iverson signing the exhibit, be sworn and allowed to testify. The trial court directed Iverson to step down while a police officer testified that Iverson had in fact signed a statement of rights. The exhibit the police officer was shown was in fact the original statement of rights signed by Iverson. Iverson then returned to the stand and denied making the statements contained in the transcript of his interrogation.

Section 29–21–01, N.D.C.C., provides for the order in which a trial must proceed. However, Section 29–21–02, N.D.C.C., allows the order to be changed.

"29–21–02. Order of trial may be changed for cause.—When the state of the pleadings requires it, or in any other case, for good reasons and in the sound discretion of the court, the order of trial and argument prescribed in section 29–21–01, may be departed from."

In addition, this court has held that the court, in the exercise of its discretion, may

change the order of trial. Killmer v. Duchscherer, 72 N.W.2d 650, 657 (N.D. 1955); Mevorah v. Goodman, 79 N.D. 443, 57 N.W.2d 600, 608 (1953); State v. Hazer, 57 N.D. 900, 225 N.W. 319, 322 (1929). The U. S. Court of Appeals in a case arising in North Dakota made a similar holding. Braatelien v. United States, 147 F.2d 888, 893 (C.A.8th 1945).

Iverson relies on State v. Hunt, 335 S.W.2d 506, 510 (Mo.App.1960). *Hunt* was a traffic case wherein the defendant took the stand in his own defense on a charge of speeding. The trial court allowed the prosecution to interrupt the defendant's testimony and recall several prosecution witnesses to ask them questions the State had neglected to ask during their direct examination. The questions related to matters on which the prosecution was trying to contradict the defendant. The Missouri Court of Appeals held that this procedure constituted an abuse of discretion, as it gave the prosecution an unfair advantage by allowing testimony beyond its case in chief.

■ Unlike *Hunt*, the interruption here was simply for the purpose of verifying Iverson's signature, which he had denied making. It was not for the purpose of filling in gaps in the State's case. We are satisfied that this interruption of Iverson's testimony on cross-examination was not an abuse of discretion and that, accordingly, the trial court acted within the power given it under Section 29–21–02, N.D.C.C.

Iverson also argues that the trial court erred when it permitted the State to present testimony regarding the identification of Iverson by a bloodhound. Iverson's counsel on this appeal notes that Iverson's trial counsel made no objection to this testimony. He contends, however, that because its certainty and probative value were highly questionable, it was too speculative to be admitted as evidence of identification notwithstanding that no objection was made.

An extensive annotation, "Evidence of Trailing by Dogs in Criminal Cases", 18 A.L.R.3d 1221, deals with the type of evidence of which Iverson complains. It appears from this annotation that twenty-five states have directly passed on the question of the admissibility of what is generally referred to as bloodhound evidence. Twenty of these states have held bloodhound evidence to be admissible, while five of these states have held it to be inadmissible. It appears that the general rule in those twenty states admitting bloodhound evidence is that, as with other evidence, a proper foundation must be laid for its admission and that it must be corroborated by other evidence.

A proper foundation generally includes evidence that the dog was of pure blood and of a stock characterized by acuteness of scent and the power of discrimination; that the dog had been properly trained and exercised in the tracking of human beings; that the person who testified to the dog's breeding and training had personal knowledge thereof; and that the dog was put on the trail at the place where circumstances tended to show the guilty party had been.

■ The bloodhound used in this case had been trained by Mr. and Mrs. Vincent Bray of Grand Forks. Mrs. Bray was called as a witness for the State. She testified that she owned and operated a bloodhound kennel; that she had raised and trained bloodhounds for seven years; that she was the vice president of the Bloodhound Club of America; that she and her husband had trained "Rye", the bloodhound used in this case; that this training was extensive and that to her knowledge Rye had never made a mistake; that Rye was given a scent from a pillowcase in Carol's apartment; that Rye twice followed a trail that ended in the alley outside Carol's apartment; that she and Rye, along with the pillowcase, were taken to the Grand Forks Police Department, where Rye was once again given a scent from the pillowcase; that he then followed

a trail into and through the police station to the place where Iverson was seated; and that he then smelled Iverson and wagged his tail and looked toward her, which is the sign that Rye had identified the source of the scent found on the pillowcase.

We are satisfied that a proper foundation was laid for the introduction of the identification of Iverson as the source of the scent found on the pillowcase, notwithstanding that the bloodhound was put on the trail 24 to 48 hours after the victims had been murdered, and that the bloodhound was transported to the police station where, after being given a fresh scent from the pillowcase, he again picked up the trail that he had lost in the alley by Carol's apartment. We also note that this bloodhound evidence was corroborated by much additional evidence.

"The fact established was a circumstance which was consistent with defendants' guilt but one which, standing alone, would have little probative value. However it was proper to receive this evidence together with that of a multitude of other circumstances which were also consistent with the defendants' guilt, because a sufficient number of such circumstances will permit a reasonable conclusion that in their aggregate they were not just a series of unfortunate coincidences." State v. Jager, *supra,* 85 N.W. 2d 240, 244.

■ A proper foundation having been laid, we are satisfied that this bloodhound evidence was of sufficient probative value to permit its being submitted to the jury for them to weigh, as they would any other evidence, along with all the other evidence in this case. It was not reversible error to allow the jury to consider this evidence.

During the course of the trial a number of in-chambers conferences were held. At the first four of these conferences Iverson was not personally present, although he had requested that he be allowed to attend these conferences. As a result, Iverson contends

his rights were violated under Section 13 of the North Dakota Constitution and Section 29–16–03, N.D.C.C.

"Section 13. In criminal prosecutions in any court whatever, the party accused shall have the right to a speedy and public trial * * * and to appear and defend in person and with counsel. * * *"

"29–16–03. *Presence of defendant if felony charged.*—If an information or indictment charges the commission of a felony, the defendant must be personally present at the trial."

If Iverson's rights were violated under Section 13 they were also violated under the Sixth Amendment to the U. S. Constitution, which provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial * * * to be confronted with the witnesses against him * * *"

The U. S. Supreme Court has held that "one of the most basic rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen, 397 U.S. 337, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970), rehearing denied 398 U.S. 915, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970). The U. S. Court of Appeals for the District of Columbia subsequently held that "the Sixth Amendment requires the presence of defense counsel and the accused at all critical stages of the prosecution." United States v. McCoy, 139 U.S. App.D.C. 60, 429 F.2d 739, 742 (1970).

Several U. S. Courts of Appeal decisions have held it error to conduct a part of the prosecution out of the presence of the defendant. In Near v. Cunningham, 313 F.2d 929, 930–932 (C.A.4th 1963), it was held to be error for the judge, the attorney for the Commonwealth, and the attorney for the defendant to agree, in chambers out of the presence of the defendant, not to sequester the jury during a recess.

In Ware v. United States, 376 F.2d 717, 717–720 (C.A.7th 1967) it was held to be harmless error to have allowed the jury to be brought back into court after submission of the case to them, to have certain testimony read to them when the defendant was not present.

In Ellis v. State of Oklahoma, 430 F.2d 1352, 1354–1356 (C.A.10th 1970) it was held to be harmless error to have held a conference in the judge's chambers outside of the presence of the defendant wherein defendant's counsel waived objection to a juror whose wife had been subjected to harassment during the course of the trial and who asked her husband to withdraw from the jury.

 In view of the foregoing, we hold that it was error to have excluded Iverson from the four in-chamber conferences. We are satisfied, however, that this error was harmless under *Chapman*. Before the court reconvened on the day following the fourth in-chambers conference, the court held a fifth in-chambers conference with Iverson in attendance for the specific purpose of reviewing with him what had taken place in the preceding four conferences.

"THE COURT : * * *

"The purpose in calling this conference is to relate information to the Defendant which occurred, for conferences on questions of law by the said Counsel and the Court.

"Prior to this time—you want to sit up here, Mr. Iverson, so you can hear better?

"On April 25, 1969, in the afternoon a conference was held in which a supplemental police report was the subject of the conference. This police report had been offered in evidence by the State, and the Court heard arguments of the State and Counsel regarding the State's offer, and Defendant's Counsel objection thereto. The Court sustained the objection of Defendant's Counsel and the evidence was excluded.

* * * * * *

"The record will also show that a conference was held April 27, 1968, in the morning at which time the State requested to make an offer of proof for the purpose of introducing testimony relating to alleged other offenses on the part of the Defendant. Counsel for the Defendant resisted the said offer of proof, and after hearing arguments, the Court sustained the objection of Counsel for the Defendant, and rejected the testimony sought to be introduced.

"A third conference was held April 28, 1968, in the forenoon. This was held to make [an] additional offer of proof relating to testimony sought to be introduced by the witness Frances Folsum, regarding the contents of a note allegedly written by the Defendant, and Counsel for the Defendant objected to this offered testimony. And upon hearing arguments regarding the offer of proof, the Court sustained the objection for the Counsel for the Defendant, and the testimony was not allowed.

"A fourth conference was held April 28, 1968, in the afternoon in which Counsel for the Defendant requested to make an offer of proof to permit testimony by a witness, Jeanette Mason Dunlap, as to statements alleged to have been made to her by the witness Curtis Peterson. The Court after hearing arguments of Counsel sustained the objection by the State and disallowed any testimony by the witness Jeanette Mason Dunlap regarding statements alleged to have been made to her by the witness Curtis Peterson.

"Does Counsel for the State and Counsel for the Defendant agree that these conferences were held and matters re-

lated thereto and decisions made were as the Court stated.

"MR. R. ALPHSON: It is the position of the State that the Court correctly stated the conferences and the subject matter and the related rulings as made.

"MR. RUBIN: The Defendant agrees, also.

"THE COURT: Do you understand, Mr. Iverson, what the Court has just said regarding these conferences?

"DEFENDANT: I understand, but I wasn't here at the time.

"THE COURT: I understand. That is the reason I'm relating this information at the present time."

In the first three of these conferences, Iverson was not prejudiced by his absence, since in each the objections of his counsel were sustained. In the fourth conference, Iverson's counsel made an offer of proof, since the objection to the testimony he sought to admit in evidence had been sustained in open court.

When the court reviewed the action of the fourth in-chambers conference, Iverson had the opportunity to object to the court's ruling and to speak through his attorney while there was still time for the court to reverse its ruling. Under these circumstances, we cannot conceive that he was prejudiced.

The error in excluding Iverson from the four conferences was thus harmless under *Chapman* and must be disregarded under Section 29–28–26, N.D.C.C.

Iverson finally contends that the court erred when it sustained objections to certain testimony as being hearsay.

On the direct examination of a defense witness, Jeanette Mason Dunlap, an objection to testimony as hearsay was sustained.

"Q. Was he walking or driving?

"A. He was driving.

"Q. Then what did you do?

"A. He asked me if I wanted a ride.

"MR. ALPHSON: I object to this! This is hearsay.

"THE COURT: Objection is sustained."

On the direct examination of Iverson, two objections to testimony as being hearsay were sustained.

"Q. All right. But, then what did you do next?

"A. They asked me if—

"MR. ALPHSON: I object to this as being hearsay.

"THE COURT: Objection is sustained.

\* \* \* \* \* \*

"Q. And then what happened to you?

"A. Leo Novacek, after my second game of bowling came and tapped me on the shoulder and said, 'Mr. Alphson would like to talk to you'. Mr. Alphson was in the building towards the street entrance and I said, 'Okay'. I went with him and Mr. Alphson said, 'Well, let's go to the basement, I have something I would like to discuss with you.' And I said, 'We could have just as well discussed them right here.'

"MR. ALPHSON: I'll object to this conversation as hearsay.

"THE COURT: The objection is sustained as to what Mr. Alphson said."

Iverson argues that these three objections were improperly sustained as being hearsay, in that all he was trying to do was to establish that certain statements had been made, and that he was not trying to establish the truth of any facts asserted in those statements.

A statement previously made out of court and offered in evidence, not for the purpose of establishing the truth of the matter stated, but merely for the purpose of establishing the fact that the statement was made, is not subject to the hearsay rule, and the only test of its admissibility is whether it is relevant to the case. 2 Jones on Evidence § 271 (5th ed. Bancroft-Whitney Co. 1958); VI Wigmore on Evidence § 1766 (3d ed. Little, Brown and Co. 1940).

The answers of the witnesses in these three instances fell within the hearsay rule. Objections having been made on the grounds that these three responses were hearsay, it was up to Iverson's trial counsel to remove the objection by arguing that the responses were solely for the purpose of proving that the statements had been made. 4 Jones on Evidence § 976. With no attempt having been made to remove the State's objection, the court correctly ruled in sustaining these objections. In addition, the witness's answer to the question asked in each instance was unresponsive and therefore properly excludable. 4 Jones on Evidence § 979.

Another ruling of the court sustaining the State's objection to testimony which Iverson's trial counsel tried to introduce is cited as error. On the direct examination of Mrs. Dunlap, Iverson's trial counsel sought to introduce into evidence statements allegedly made by the witness Curtis Peterson during two separate telephone conversations with Mrs. Dunlap prior to the trial of this case. The sustaining of the State's objections to several attempts to introduce in evidence the statements made by Peterson in these conversations led to an in-chambers conference in which Iverson's trial counsel made an offer of proof. In his offer of proof he stated that if Mrs. Dunlap were allowed to testify, she would testify that the State's witness, Curtis Peterson, had called her in February 1969 and again one and a half weeks before the trial, asking her to substantiate his statements under oath. Iverson's trial counsel contended that these statements were admissible as they related to Peterson's credibility.

This testimony was objected to and sustained prior to the in-chambers offer of proof, in that it was too remote in time and place. This same objection was renewed in chambers after the offer of proof. An objection based on remoteness of time goes to the relevance of the offered testimony, with wide discretion in the trial court as to its admissibility. 1 Jones on Evidence §§ 152 and 153. The State, however, expanded its objection to attack the testimony set forth in the offer of proof, on the grounds that it was hearsay. As noted above, an out-of-court statement is not covered by the hearsay rule if it is offered in evidence simply to prove that it was made. Such a statement, however, must be relevant. The court did not abuse its discretion in sustaining the State's objection that the testimony in the offer of proof was too remote in time, which is to say that it was not relevant. The court correctly pointed out to Iverson's trial counsel that if he wanted to impeach Peterson he could attempt to do so by having Mrs. Dunlap testify as to her version of her relationship with Peterson so that a contrast could be drawn between the testimony of the two witnesses. Furthermore, a conversation between Mrs. Dunlap and Peterson as to whether or not they had been together on the evening prior to the time the autopsy revealed Carol and Diane had been strangled was irrelevant as to the issue of Iverson's guilt or innocence.

The Supreme Court of Minnesota, in reviewing a first-degree-murder conviction on an appeal containing twenty-one legal issues, affirmed the conviction and held that despite the existence of errors the defendant had received a fair trial.

"Because of human involvement, no criminal proceeding disposed of by a trial

is likely to be completely free of defects, irregularities, or errors. Only those of such character as prejudice substantial rights justify granting a new trial. Whether substantial rights are affected requires an examination of the entire record and the probable effect of the defects or errors determined in the light of all of the evidence and proceedings viewed as a whole." State v. Mastrian, 285 Minn. 51, 171 N.W.2d 695, 710 (1969), cert. denied 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970).

Upon a review of the entire record of this case and upon consideration of the errors cited by Iverson, we conclude that he received a fair trial. " 'A defendant is entitled to a fair trial but not a perfect one.' " Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Accordingly, the verdicts of the jury and the judgments of the district court are affirmed; and the order of the district court denying the motion for a new trial is affirmed.

STRUTZ, C. J., and PAULSON and KNUDSON, JJ., concur.

TEIGEN, Justice (concurring specially).

I concur in the opinion of the majority except as to those matters contained in paragraphs numbered 23 through 27 of the syllabus, together with that portion of the opinion upon which these paragraphs are based. It is not my intent to dissent to the law expressed, but I do not agree that the law expressed is applicable in this case.

The subject matter of this special concurrence relates principally to the seizure and admission in evidence of the towel.

The majority hold that the towel "was lawfully seized and admitted in evidence as a means of committing a felony" and that the unauthorized nighttime search was

harmless error because the officers did not invade the defendant's privacy as he was not at the home when it was searched. They conclude that the unlawful authorization of a nighttime search was a technical error, which was harmless and must be disregarded on appeal.

I feel that this is a strained construction. The officers found and seized the towel while they were searching the home of the defendant's parents, with whom he lived. They saw spots on it, which they thought might be blood. Subsequently, the towel was examined by laboratory technicians. They found that the towel contained blood spots of the same type blood as that of one of the victims and of the defendant. The defendant's father testified at the trial that he had the same type blood as was found on the towel; that he had a rough skin and sometimes cuts himself while shaving and, when he does so, he wipes the blood from his face with a towel. The house had a common bathroom. The towel was found by the officers in a clothes hamper, along with other dirty clothes, in the basement of the home being searched. In view of this evidence, it was a question for the jury to determine whether the defendant, or his father, had used the towel. Defendant denied the charge against him and introduced alibi testimony. In my opinion, the towel was mere evidence. It was seized by the officers while conducting an unauthorized nighttime search and was not particularly described in the search warrant.

The federal constitution requires that articles seized must be particularly described in the search warrant, but does not prohibit nor require a positive showing, as do our statutes, to authorize a nighttime search. The federal constitution does not prohibit the seizure of mere evidence under a search warrant. Warden, Maryland Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

The only federal question which arises is whether the towel was unlawfully seized

because it was not particularly described in the warrant.

A body of federal case law has developed upholding the right of officers searching pursuant to a search warrant to seize items not described in the warrant if those items are subject to seizure as an incident of lawful arrest. In Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), the Supreme Court held that the seizure of certain articles not described in the search warrant being executed was not justified, but nevertheless upheld the seizure on the theory that the articles in question were seized incident to the arrest of a codefendant of Marron while he was on the premises being searched under the warrant. The court reasoned that the officers had a right, contemporaneously, to search the place without a warrant and to seize the items used to carry out the criminal enterprise.

In Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), the United States Supreme Court held that where a search was made incident to an arrest and, in the course of the search, the officers came upon draft cards, although not related to the crime for which the defendant had been arrested and not objects of the search but which were the property of the United States in the illegal custody of the defendant and for which he was guilty of a serious and continuing offense against the laws of the United States, the draft cards could also be legally seized and used as evidence against him on another charge.

Subsequent to *Marron* and *Harris,* case law on searches was further developed, upholding the right of officers searching pursuant to a search warrant to seize items not described in the warrant if those items were subject to seizure as an incident of a lawful arrest. Many of these cases are cited by the majority but only for the proposition that the property seized and not described in the search warrant consti-

tutes an instrumentality of the crime, or a means of committing a felony. These cases hold that although a search warrant must describe the things to be seized and a search must be directed toward the things so described, nevertheless, items not named in the warrant but which are discovered in the search pursuant to the warrant may be seized if they could have been seized in a search incident to a lawful arrest. Since, in *Warden,* the United States Supreme Court rejected the distinction between seizure of items of evidential value only and seizure of instrumentalities, fruits or contraband under the Fourth Amendment to the United States Constitution, mere evidence is given the same standing under these search warrant cases as instrumentalities, fruits or contraband and, in my opinion, mere evidence may be seized by officers under a warrant, whether particularly described therein or not, if such evidence could have been seized as an incident of lawful arrest. Such seizure is no longer considered a violation of the Fourth Amendment to the United States Constitution.

The principal thrust of the defendant's objections is based upon the claim that our search warrant statutes were violated in that they do not permit a search for mere evidence, and that the requirements for a nighttime search are not set forth in the affidavits for a search warrant. This raises a state issue and the federal decisions based on the Federal Rules of Criminal Procedure are not controlling, nor particularly significant in its determination. The provisions of our statutes on search warrants are more stringent than the requirements of the fourth amendment to the federal constitution and, also, are more stringent than the requirements of Section 18 of our state constitution. The two statutes in question are set forth in full in the majority opinion. Section 29-29-02, N.D.C.C., briefly stated, provides for limited grounds upon which a search warrant may be issued. They are as follows: (1) when the property is stolen or embezzled;

(2) when the property was used as a means of committing a felony; and (3) when the property is in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he may have delivered it for the purpose of concealing it and preventing its discovery. This statute does not authorize a search for mere evidence.

Section 29–29–10, N.D.C.C., requires that a search warrant must be served in the daytime unless the affidavits are positive that the property is on the person or in the place to be searched, in which event it may be served at any time. The affidavits in this case do not set forth the requirements of this statute for a nighttime search. The search in this case was made shortly after midnight.

Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), holds that all evidence obtained by searches and seizures in violation of the fourth amendment to the federal constitution is constitutionally inadmissible in evidence, and applies the exclusionary rule to the states. Historically, prior to *Mapp*, North Dakota followed the common-law rule of admissibility. State v. Fahn, 53 N.D. 203, 205 N.W. 67 (1925); State v. Pauley, 49 N.D. 488, 192 N.W. 91 (1922); State v. Lacy, 55 N.D. 83, 212 N.W. 442 (1927). The common-law rule of admissibility has also been followed in more than fifty percent of the states, Canada and England. 50 A.L.R.2d 531–546, and later case service. In accordance with the common-law rule, the admissibility of evidence is not affected by the illegality of the means by which it was obtained.

In State v. Manning, 134 N.W.2d 91 (N.D.1965), we held that evidence obtained in violation of the Fourth Amendment to the United States Constitution is not admissible in evidence following *Mapp*. The decision in *Manning* modified our holding in *Fahn* to the extent that where the evidence was obtained in violation of the federal constitution it was not admissible in evidence.

*Manning* was followed by State v. Dove, 182 N.W.2d 297 (N.D.1970). In *Dove* we applied Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and found that the evidence in *Dove* was obtained in violation of the federal constitution. We then reviewed the question to determine whether we should apply the harmless error rule in light of Fahy v. State of Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), and Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and determined that it could not be said that the evidence obtained and admitted in violation of the fourth amendment was harmless beyond a reasonable doubt. We concluded that because the evidence was obtained by an unlawful search under the fourth amendment, it was inadmissible in the trial, and that because it was the only evidence upon which the conviction was based, the error in admission was prejudicial, and the conviction was reversed.

I concurred specially in *Dove* because I was concerned with the wording of paragraph number 3 of the syllabus, which stated:

"Where a search warrant was based upon an insufficient affidavit, any evidence obtained as a result of the search is inadmissible."

It was my feeling that the wording of that paragraph was too broad and that it was tantamount to adopting the exclusionary rule in this state, including violations of the state search warrant requirements. In *Dove* we said, in applying the harmless error rule:

"An error in admitting plainly relevant evidence which possibly influenced the jury adversely to a litigant cannot, under *Fahy*, be conceived of as harmless."

In this case the majority have said that because there was a statutory violation but not a constitutional violation it is proper to apply the harmless error rule. They do so in spite of the fact that the evidence obtained was highly prejudicial to the defendant. The three items, consisting of the trenchcoat, a pair of trousers, and the towel, were all seized as a result of the after-midnight search, and contained blood and hair which compared with the blood and hair of the two victims. It appears to me that what the majority, in effect, have held is that, although it was violative of statute to have received the articles in evidence, nevertheless, because the error was statutory and not constitutional, it is only a technical error and will be disregarded on appeal. Therefore, it appears that paragraph number 3 of the syllabus in *Dove* must have been intended to have reference only to constitutional violations and not to statutory violations, although the majority refused, at the time *Dove* was written, to clarify paragraph number 3 of the syllabus in light of my special concurrence.

In effect, it appears to me that the majority in this case have applied the common-law rule of admissibility on review in the supreme court. I see no reason why we should not continue to apply the common-law rule of admissibility in this state at the trial court level where the evidence was not obtained in violation of the Fourth Amendment to the United States Constitution. I think that we should specifically hold that the federal exclusionary rule of evidence is applicable in North Dakota only if the search does not meet the requirements of the federal constitution, and continue to apply the common-law rule in all other cases.

For the reasons aforesaid, it is my belief that there was no error in the admission of the evidence in question even though it may have been obtained in violation of our search warrant statutes.