2008 ND 146

**STATE of North Dakota, Plaintiff and Appellee**

v.

**Michael SCHOLES, Sr., Defendant and Appellant.**

No. 20070316.

Supreme Court of North Dakota.

July 21, 2008.

James M. Vukelic, Acting State's Attorney, Bismarck, ND, for plaintiff and appellee.

Jessica J. Ahrendt, Valley City, ND, for defendant and appellant.

CROTHERS, Justice.

[¶ 1]   Michael William Scholes, Sr., appeals a criminal judgment entered on a conditional plea of guilty to four counts of class AA felony gross sexual imposition, one count of class A felony gross sexual imposition, and four counts of class B felony use of a minor in a sexual performance. We conclude the district court did not err in denying Scholes's motion to suppress evidence because probable cause existed to issue a search warrant for his residence, because the State's failure to comply with the literal terms of N.D.R.Crim.P. 41 does not require suppression of the evidence under the circumstances and because Scholes failed to establish that the State intentionally or recklessly omitted facts material to the issuance of the search warrant.  We affirm.

I

[¶ 2]   Scholes is the father of two sons, M.S., born in 1994, and R.S., born in 1995. Scholes also has a stepson, M.A., and a

stepdaughter, A.A., who were both born in 1994. The family lived in Carson.

[¶ 3] In 2006, Dickinson attorney Kelly Armstrong was appointed to represent the children in a juvenile court action brought by the director of the Grant County Social Service Board against Scholes and the other parents to gain custody of the children. On December 7, 2006, during the course of his investigation in the juvenile court action, Armstrong prepared the following affidavit:

2.  That on December 6, 2006, at approximately 4 p.m. MT, I conducted an interview with 3 of my 4 clients, [R.S.], [A.A.], and [M.A.] at Michael Scholes, Sr.'s residence. I have permission from both Michael Scholes, Sr., and his attorney to conduct these interviews. I spoke briefly with all 3 of my clients while Michael Scholes, Sr. was in the room. I then interviewed each of my clients separately.

3.  I spoke with [R.S.] first. [R.S.] was visibly agitated and upset. When I asked him questions, he would start talking in a very low tone. He told me he did not want to testify at the hearing scheduled for next Thursday, December 14, 2006. I asked [R.S.] numerous questions about the case which he answered. He then asked if he could write the Judge a letter. I told him he could. He asked if his Dad and his Grandmother would be able to see this letter, I asked why, [R.S.] then told me that he was very scared of his father and grandmother. Throughout this conversation he was whispering in a very low tone. He was obviously afraid of being overheard.

4.  I then interviewed [M.A.] and [A.A.]. They were both in good moods and the interviews were short. [R.S.] came back up from the basement and said he had to talk to me again. He told me that ... "I know why Dad likes [A.A.] better." He was whispering very quietly and I could barely hear him. [R.S.] informed me that recently [M.A.] had found videos of Michael Scholes, Sr. and [A.A.]. I asked what kind of videos and he told me they were naked. I asked where they were, he told me they were in Dad's big brown dresser in his bedroom. [R.S.] then handed me a note, a copy of which is attached, saying that his dad might be taping the conversation. At this point, I decided to terminate the interview.

5.  As I was leaving the house, [R.S.] walked me out to my car. When I explained to [R.S.] how serious the situation was and that I may have to report it to the police, he started crying and shaking uncontrollably. He said he was very scared of his father and grandmother and begged me not to tell the police. I told [R.S.] I would call him immediately the next day at school and that I would not do anything until I spoke to him again. Before I left, [R.S.] stated, "Please, just get me out of here. I'm thinking about killing myself." I spoke with [R.S.] a little more until he calmed down and got him to promise to not do anything until I talked to him tomorrow. He agreed.

6.  This morning, at approximately 8:30 a.m. MT, I called [R.S.] at school. I spoke with him again about what he had told me the night before. He explained that there were 2 videos, a normal VHS and a small camcorder video in Michael Scholes, Sr.'s big brown dresser. I asked him to de-

scribe in detail how he knew this. [R.S.] told me that recently when [A.A.] was sick and Michael Scholes, Sr. took her to the hospital, he [R.S.] was taking a bath. When he got done with his bath, he walked into the living room and [M.A.] was watching a video of [A.A.] and Michael Scholes, Sr. [R.S.] said the videos were located in the big brown dresser in Michael Scholes, Sr.'s bedroom. I informed [R.S.] again that we may have to report this to the police and he freaked out. I then decided to drive to Carson and speak to [R.S.] personally.

7. I met with [R.S.] at Grant County Junior High School in Carson. He informed me that there were also naked pictures of [A.A.] in the little white dresser in Michael Scholes, Sr.'s bedroom. [R.S.] informed me that when Michael Scholes, Sr. took [A.A.] to the hospital, he forgot to lock his bedroom door. While [R.S.] was in the bath, [M.A.] took one of the videos and began watching it. Upon leaving the room, [M.A.] accidentally locked the door. When [R.S.] got out of the bath and saw the video, [M.A.] and [R.S.] decided to put them away so they would not get into trouble. [R.S.] picked the lock to his father's bedroom door and they replaced the videos. [R.S.] also told me that [A.A.] still sleeps in Michael Scholes, Sr.'s room every night. [R.S.] also told me that Michael Scholes, Sr. may have hid these items in the attic. [R.S.] is adamant that these items are still in the house.

8. [R.S.] is terrified of his father and grandmother. Several times during the course of this interview, he cried and begged me to get him out of the house. In my experience as an attorney, I have conducted numerous cross-examinations. Throughout the course of these interviews with [R.S.], I attempted to trip up [R.S.'s] answers. With regard to the videos and pictures, [R.S.'s] answers were very consistent. When I left the school, I informed [R.S.] that I had no choice but to report this. He was so visibly shaken and upset that school staff kept him in the office.

9. Upon receipt of this information, I am extraordinarily worried about my clients' health and safety. [R.S.'s] affirmation that he is thinking of killing himself and his numerous emotional outbursts lead me to believe that it is imperative that he be removed from his father's home immediately. I have no reason to doubt what [R.S.] told me. My concern is that if the items that [R.S.] swears are located in Michael Sr.'s home have been moved, destroyed, or not found, and [R.S.] is told that he has to return to the home, that he may harm himself. [R.S.'s] only concern is about not going back to the home.

10. I believe I am legally and ethically obligated to report this information, as my client has informed me that there is a crime being committed. Also, as I represent [A.A.] as well, obvious risk to her safety compels me to file this affidavit.

[¶ 4] The affidavit contained the caption for the juvenile court case and was notarized by the Grant County Clerk of Court. Because the Grant County State's Attorney was out of the state at the time, Armstrong gave the affidavit to the Grant County Sheriff. The Grant County State's Attorney was contacted, and he contacted the Morton County State's Attorney, who presented the affidavit to a district court

judge. The district court judge found probable cause existed and issued the warrant to search Scholes's residence. Law enforcement officers discovered incriminating evidence during the search, and Scholes was charged with the crimes.

[¶ 5] Scholes moved to suppress the evidence claiming no probable cause existed to issue the search warrant. Scholes also requested and was given a *Franks* hearing, *see Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to consider his allegation that the State omitted relevant facts in obtaining the warrant. The district court denied the suppression motion. The court found there was probable cause to issue the search warrant and found "Scholes did not demonstrate that there were any omissions of facts that would have been material to [the district court judge's] determination" of probable cause. Scholes entered a conditional plea of guilty to the criminal charges under N.D.R.Crim.P. 11(a)(2), reserving his right to appeal from the denial of his motion to suppress evidence.

## II

[¶ 6] Scholes argues the district court erred in denying his suppression motion because probable cause did not exist to issue the search warrant.

[¶ 7] "[A] district court's decision ... [on] a motion to suppress [evidence] will not be reversed [on appeal] if there is sufficient competent evidence capable of supporting the district court's findings, and ... if its decision is not contrary to the manifest weight of the evidence." *State v. Fischer*, 2008 ND 32, ¶ 10, 744 N.W.2d 760 (quoting *State v. Goebel*, 2007 ND 4, ¶ 11, 725 N.W.2d 578). "Questions of law are fully reviewable on appeal, and whether a finding of fact meets a legal standard is a question of law." *State v. Goebel*, 2007 ND 4, ¶ 11, 725

N.W.2d 578. "Whether probable cause exists to issue a search warrant is a question of law which is fully reviewable on appeal." *Roth v. State*, 2007 ND 112, ¶ 18, 735 N.W.2d 882.

[¶ 8] The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures. *State v. Proell*, 2007 ND 17, ¶ 8, 726 N.W.2d 591. A search warrant may be issued only upon a showing of probable cause. *State v. Ebel*, 2006 ND 212, ¶ 12, 723 N.W.2d 375. Probable cause to issue a search warrant exists "when the facts and circumstances relied upon by the judge who issues the warrant would lead a person of reasonable caution to believe the contraband or evidence sought probably will be found in the place to be searched." *State v. Schmalz*, 2008 ND 27, ¶ 11, 744 N.W.2d 734. We review the validity of a search warrant using the totality-of-the-circumstances approach, "consider[ing] all information for probable cause together[ ] and [ ] test[ing] affidavits executed in support of a warrant in a commonsense and realistic fashion." *Proell*, at ¶ 12. "We generally defer to a magistrate's determination of probable cause if there was a substantial basis for the conclusion, and [we resolve] doubtful or marginal cases ... in favor of the magistrate's determination." *Roth*, at ¶ 18.

[¶ 9] Armstrong, the affiant, is an attorney, and his client, who provided the information contained in the affidavit, is the named son of the defendant. As identified citizen informants, both "are presumed to be reliable sources of information." *See Ebel*, 2006 ND 212, ¶ 15, 723 N.W.2d 375. Armstrong's statements are entitled to even more reliability because of his status as an officer of the court. *See State v. Harmon*, 1997 ND 233, ¶ 13, 575 N.W.2d 635; *Interest of J.B.*, 410 N.W.2d 530, 532 (N.D.1987). R.S., who was 11

years old at the time, described in detail where the items sought were located and how he had become aware of them. R.S.'s answers to Armstrong's questions remained consistent despite Armstrong's efforts to "trip up" R.S.'s recollection. Armstrong described R.S. as being "terrified" of his father and extremely "shaken and upset" when told that this information had to be reported to the police. Although R.S. did not describe in detail what appeared in the photographs and videos other than that A.A. and Scholes were "naked," R.S.'s description of the secretive nature of their location and the revelation that A.A. sleeps in Scholes's room every night permits a reasonable inference that the photographs depicted unlawful sexual contact.

[¶ 10] Considering the affidavit in a commonsense and realistic fashion under the totality of the circumstances, we conclude probable cause existed for issuance of the search warrant.

### III

[¶ 11] Scholes argues the search warrant is invalid because the affidavit in support of the warrant was notarized by the Grant County Clerk of Court. Because this violates the requirement in N.D.R.Crim.P. 41(c)(1)(A) that a warrant "may issue only on an affidavit or affidavits sworn to . . . before a state or federal magistrate," Scholes contends the evidence must be suppressed.

[¶ 12] Rule 41, N.D.R.Crim.P., "is designed to implement the provisions of Article I, Section 8, of the North Dakota Constitution and the Fourth Amendment to the United States Constitution." Explanatory Note, N.D.R.Crim.P. 41; *see also State v. Iverson*, 187 N.W.2d 1, 32 (N.D. 1971). This Court has held that suppression is the appropriate remedy for violations of the provisions of N.D.R.Crim.P. 41

under some circumstances. *See, e.g., Roth*, 2007 ND 112, ¶ 31, 735 N.W.2d 882 ("[T]he provision of Rule 41(c) governing nighttime warrants implicates substantive constitutional rights, particularly the right to be free from unreasonable searches and seizures under the Fourth Amendment."); *State v. Fields*, 2005 ND 15, ¶ 14, 691 N.W.2d 233 (suppression is appropriate remedy for an illegal nighttime search under N.D.R.Crim.P. 41(c)). However, not every violation of N.D.R.Crim.P. 41 results in suppression of evidence.

[¶ 13] In *State v. Runck*, 534 N.W.2d 829, 832 (N.D.1995), this Court held that "leaving an unsigned and undated copy of the search warrant at the farmstead was a ministerial violation of Rule 41, N.D.R.Crim.P., that does not warrant suppression of the evidence seized upon execution of the warrant." This Court ruled that absent a showing that the defendant was prejudiced, or that the violation was an intentional and deliberate disregard of the rule, or that the violation offends the Fourth Amendment, suppression is not required for violations of the provisions of N.D.R.Crim.P. 41. *Id.*

[¶ 14] There is no evidence that Scholes was prejudiced by this violation of N.D.R.Crim.P. 41(c)(1)(A) or that the State intentionally or deliberately disregarded the rule. "The provision for examination of the affiant before the magistrate is intended to assure the magistrate an opportunity to make a careful decision as to whether there is probable cause based on legally obtained evidence." Explanatory Note, N.D.R.Crim.P. 41. The affiant in this case was an attorney, and the district court judge had the ability to contact Armstrong to clarify any questions the judge may have had about the affidavit. A clerk of district court is authorized to administer oaths. *See* N.D.C.C. § 44–05–01(2). We conclude an affidavit in support of a search

warrant sworn to before a clerk of court rather than before a state or federal magistrate does not offend the Fourth Amendment, and we join the courts that have refused to require suppression of evidence for technical violations of rules equivalent to the N.D.R.Crim.P. 41(c)(1)(A) sworn-affidavit requirement. *See United States v. Brooks*, 285 F.3d 1102, 1104–06 (8th Cir.2002) (affidavit for search warrant signed in presence of notary public and given to state judge did not violate Fourth Amendment); *People v. Chavez*, 27 Cal. App.3d 883, 104 Cal.Rptr. 247, 248–49 (1972) (defendant's constitutional rights were not violated where clerk of court administered oath, had affiant sign affidavit in her presence and took affidavit to judge who issued search warrant); *People v. Fournier*, 793 P.2d 1176, 1179 (Colo. 1990) ("Although we acknowledge in this case that the literal terms of Crim.P. 41(c)(1) were not complied with when the judge issued the search warrant based on an affidavit sworn to before the clerk of the court, we are satisfied that noncompliance with the rule is not the categorical equivalent of a constitutional violation that automatically triggers exclusionary rule principles."); *State v. Bicknell*, 140 Idaho 201, 91 P.3d 1105, 1107 (2004) ("The Defendants have not cited, nor have we found, any authority supporting the proposition that the Fourth Amendment requires that an affidavit submitted in connection with an application for a search warrant must be signed in the presence of the person issuing the warrant."); *see also* 2 W. LaFave, *Search and Seizure*, § 4.3(e), at n. 58 (4th ed. 2004).

[¶ 15] We conclude the clerk of court's attestation on the affidavit in support of the search warrant did not invalidate the search warrant or require suppression of the evidence.

IV

[¶ 16] Scholes argues the district court erred in determining there were no omissions of facts by the State in applying for the search warrant that would have been material to the judge's determination of probable cause. Scholes claims the sheriff and prosecutor knew, but failed to inform the judge, that there was a past allegation of sexual abuse of A.A. by Scholes, that A.A. was interviewed by professionals and that both Scholes and A.A. denied the sexual abuse.

[¶ 17] "[T]o succeed on a *Franks* challenge based on omitted information, the defendant must show: (1) that [law enforcement officers] omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading; ... and (2) that the affidavit[,] if supplemented by the omitted information[,] would not have been sufficient to support a finding of probable cause." *State v. Ballweg*, 2003 ND 153, ¶ 17, 670 N.W.2d 490 (quoting *State v. Holzer*, 2003 ND 19, ¶ 7, 656 N.W.2d 686). "Whether the defendant has demonstrated recklessness or deliberate falsity is a finding of fact reviewed under the clearly erroneous standard." *State v. Damron*, 1998 ND 71, ¶ 10, 575 N.W.2d 912 (quoting *State v. Morrison*, 447 N.W.2d 272, 275 (N.D.1989)). " 'A finding of fact is clearly erroneous when it is induced by an erroneous view of the law, when there is no evidence to support it, or when, although there is some evidence, on the entire evidence, the Court is left with a definite and firm conviction a mistake has been made.' " *State v. Donovan*, 2004 ND 201, ¶ 8, 688 N.W.2d 646 (quoting *State v. Jones*, 2002 ND 193, ¶ 11, 653 N.W.2d 668).

[¶ 18] The district court's finding there were no omissions of fact material to the judge's probable cause determination is an

implicit finding that there was no intention on the part of the prosecution to make the affidavit misleading and that the prosecution did not engage in any reckless conduct in obtaining the warrant. These findings are not clearly erroneous. The Grant County State's Attorney was unavailable. The assistance of a state's attorney from another county was required. Time was of the essence. Moreover, the inclusion of this information would not have defeated a determination of probable cause. Rather, inclusion of this information could have bolstered the finding of probable cause because it would have explained Scholes's secrecy and increased the probability that Scholes was engaging in an incestuous relationship with his stepdaughter. A previous investigation resulting in no charges does not establish that sexual abuse had not occurred or was not occurring.

[¶ 19] We conclude the district court did not err in determining Scholes failed to establish the State intentionally or recklessly omitted facts material to the issuance of the search warrant.

V

[¶ 20] The criminal judgment is affirmed.

[¶ 21] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER and DALE V. SANDSTROM, JJ., concur.